ARNOLD v. ARNOLD.

Opinion delivered November 2, 1914.

1. DIVORCE—ALLEGATIONS—CORROBORATION.—In an action for divorce, a decree will not be granted upon grounds testified to by plaintiff, but which are not corroborated by other witnesses.

2. DIVORCE—NON-SUPPORT.—Nonsupport is not a ground for divorce in Arkansas.

3. DIVORCE—GROUNDS—OPINIONS OF WITNESSES.—In an action for divorce general statements of witnesses in the nature of opinions or conclusions are not sufficient grounds; specific acts or words must be shown by which the court can determine whether or not the challenged conduct constituted a ground for divorce under the statutes.

4. DIVORCE—THREATENED VIOLENCE.—One instance of threatened violence will not be sufficient of itself to justify the granting of a decree of divorce.

5. DIVORCE—MUTUAL FAULT.—A divorce will not be granted because of the conduct of the defendant in arguing, quarreling and finding fault with the plaintiff, when both are guilty of the same conduct.

6. DIVORCE—GROUNDS FOR.—A decree of divorce should not be granted except upon clear proof of one or more of the grounds prescribed by the statute.

Appeal from Howard Chancery Court; *Jas D. Shaver,* Chancellor; affirmed.

STATEMENT BY THE COURT.

Appellant instituted this suit against the appellee in May, 1913, alleging that they were married in 1902, and lived together until January, 1913, at which time the appellant abandoned the appellee. She alleged that about two years after their marriage appellee became quarrelsome and was rude toward and neglectful of the appellant, and that this disposition toward her became more pronounced as the years went on; that appellee failed to provide for her, and that after a child was born to them he still failed to provide support for appellant and their child; that appellant earned by her own labor support for herself and child, and since the year 1906 all that she had been able to accumulate had been expended in the support of herself, her child and appellee. The gravamen of her complaint as to indignities is as follows: "That the indignities offered to the plaintiff by the defendant consists of insult, rudeness, abuse, threatening to whip her, making demonstrations, refusing to permit her and her child to go to Sunday school and church without a row, which conduct was systematically pursued by defendant toward plaintiff until her condition was rendered intolerable and she was forced to leave defendant and go to the home of her father for protection."

Appellee denied those allegations of appellant's complaint which set up her cause for divorce.

The appellant testified, in substance, that about two years after her marriage with the appellee that he began abusing and quarreling with her, and from that time on failed to provide for her. She stated that she began work to provide for her family in 1906 because she was really in need. From 1910 until 1912 they rented a house from Banks Wright and she paid the rent out of her own earnings. During that time appellee was very quarrelsome and abusive toward her. From 1906 to 1913 she had earned the sum of $1,458.75 in money, which was used in supporting the family. They had to give up the house because the conduct of her husband was so bad toward her that the landlord, Mr. Wright, requested them to move out. While abusing and quarreling at her, defendant would say ''that she was crazy.'' He also threatened her with violence with a club a few days before she left him. About three days after that they were having other trouble, and she told the defendant she was not going to live with him any longer. Defendant had made nothing for herself or the baby, and he had not supplied anything for their support since she left him. He often quarreled with her in the presence of others. He often used insulting and abusive language toward her in the presence of Mr. Banks Wright. Her health got so bad that she was unable to live with him at all, and was that way for several months before she did leave him, and he got worse all the time. The defendant failed to provide for her and her child and refused to furnish a doctor when they were sick.

There is much more of appellant's testimony, but it is unnecessary to set the same out in detail. The above covers the salient points in support of the allegations of her complaint.

Witness Wright testified that plaintiff and defendant rented a house from him in Nashville, where they lived about two years. He boarded with them, and they ''seemed at first to get along first rate, but later on there got to be a good deal of nagging, a good deal of quarreling,'' and that continued as long as witness could stand

it, and he told them they would have to move from his house, and the conduct of defendant was such as to arouse the sympathy of any one in behalf of plaintiff. ''At times both plaintiff and defendant participated in the quarreling and nagging. Witness did not remember the language used by each toward the other. At times they used abusive and insulting language. The defendant objected to the plaintiff attending church so much. It sounded like quarreling to witness when they were nagging and quarreling. They just disputed with each other. He never heard any threats made during the time they lived in his house. He never saw the defendant do any work around the house. Mrs. Arnold and her baby were sick some while they lived in his house and defendant seemed to be attentive at the time they had the measles.

The sister of plaintiff testified that she had often seen the plaintiff and the defendant when they were fussing. At one time when she came upon them fussing plaintiff remarked that she didn't think she would put up with that condition always, and defendant spoke up and said, ''I hope to God you won't; I wish you would leave; there are forty women in Nashville I could marry.'' She tells about her sister providing for the family and teaching music, keeping boarders and canvassing for the sale of dress goods. She heard the defendant refuse the request of the plaintiff to buy her clothing that she said she needed to wear to church. Defendant would say he couldn't get them for her; that he didn't have the money. If defendant ever made any effort to assist the plaintiff to get clothing so she could attend church witness never knew of it. ''A good deal of the trouble between plaintiff and defendant has grown out of the fact that plaintiff wanted to carry the baby to church and defendant objected to it,'' and witness never knew any reason for it except he just didn't want her to go. She had heard the defendant object to plaintiff going to church a number of times. ''He would object and wanted to go home and go to bed and then there would be a row.''

Plaintiff's father testified to the fact that she had to work to support herself and family, and that he had raised her to attend church, and that she had always been accustomed to attend church during the time that she lived at his house before her marriage.

A brother of the plaintiff testified that he had heard quite a good many disturbances between his sister and the defendant; that defendant "seemed not to stand back from getting into a row."

A witness by the name of Koonce testified that plaintiff and defendant rented a house from him in August, 1912, in which they lived about six months. Witness and his daughter, who was then about fourteen years old, boarded with the plaintiff and defendant while they were living in witness's house. During this time there was a good deal of disturbance and quarreling among them. A good deal of it was about the church. The defendant objected to the plaintiff and the little girl attending church. Whenever she would speak of going to prayer meeting or church he would begin to quarrel at her and it would continue until she would leave for church. These troubles were continuous between them. Witness slept in a room close to them at night and often heard them quarreling during the night, and it got worse during the time they lived in his house. Plaintiff worked regularly. In addition to doing her house work, she canvassed selling dress goods. If defendant ever worked any witness did not know it. During the time they lived in his house defendant would always, or generally, start the fuss between them. The quarrels' were every Sunday and all the time between them. It was a quarrel every time the plaintiff said anything about going to church. Defendant sometimes wanted her to go to church with him and she would sometimes go. She belonged to the Baptist church and he to the Methodist church. The witness did not remember the language used during these quarrels, but he thought the language defendant used toward the plaintiff would hurt her feelings. The defendant was continuously nagging at the

plaintiff about her religion—quoting Scripture in a sarcastic way. Defendant would oftentimes raise a row at meal times about the preparation of food.

The testimony of Miss Kate Koonce corroborated, substantially, the testimony of her father. She testified, in addition, that she heard the defendant on one occasion make threats against the plaintiff, "threatening to take a club and fight it out about going to church. The rows they had would continue until late in the night and sometimes would be renewed the next morning." Witness could not use the language that they used toward each other. They were both quarreling, but the plaintiff didn't participate in it as much as the defendant. The plaintiff tried to avoid the quarrels. At the time she heard the defendant threaten to use a club on plaintiff it was about three days before plaintiff left him.

The plaintiff, on being recalled as a witness, stated that she had no love for the defendant and could not possibly care for a man that would treat her as defendant had. Among other things, she says: "He has often accused me of infidelity, for the last year or more especially. I went to the office of Doctor Dildy in company with the defendant. The doctor remarked that when I got better to come to his office later on, and when I got home I remarked I was glad I had some bills all paid. He (the defendant) became furious, and wanted to know if I had gone to the doctor's office. He said, 'Why didn't he say bring your wife instead of send your wife?' I told him I had not been to the office, but I suppose he didn't hear me; he just kept nagging and abusing the doctors of the town, walked out in the yard, chopped two or three licks, came back in the house and said, 'Well, the camel's back is broken, and that trip to the doctor's office is what did it;' and I said, 'Well, let it be broken; I don't care.' He said, 'You went to that doctor's office against my will, you go to Sunday school against my will.'"

She further testified: "He could not tell to save his neck when he accused me of being untrue to him who it

was that I was intimate with, but he would mention different parties." Plaintiff further testified that the form of cruelty most painful to her was the accusation made by the defendant against her of infidelity.

Several witnesses testified in behalf of the appellee that they were acquainted with the plaintiff and that they had seen them together frequently and visited them, and some of these witnesses were neighbors to the plaintiff, and defendant, and they didn't hear any quarreling between them. This testimony was mostly of a negative character.

One of the witnesses testified that plaintiff and defendant lived at his house about three months. She didn't observe any ill-treatment or abusive language on the part of the defendant toward the plaintiff while they lived there. At that time the baby was about three years old. The defendant at that time paid a great deal of attention to the baby. She didn't know whether he was devoted to his wife or not; she paid no attention to that. She heard no bickerings or quarrels between them. She paid so little attention she couldn't say whether defendant was quarrelsome or abusive toward his wife or not. The defendant, at that time, was about the house a great deal. He had no employment of any kind outside of his law practice. She heard Mrs. Arnold complain, during the time that her sister was visiting her while they were living at witness's house, about having no clothing to wear.

The defendant, in his own behalf, testified at length, denying substantially all of the testimony as to the quarrels as detailed by the appellant and her witnesses. He stated that at the time the plaintiff left him he had gone to Oklahoma for the purpose of renting a home and a law office, preparatory to moving to Oklahoma. At that time he had had no intimation from his wife that she would not accompany him to Oklahoma. She had acted very cool and distant, but had made no complaint about quitting him. When he came back and found she was gone he was shocked, and asked her what she meant, and she

said she had quit, and he asked her reasons for it, and she refused to give any, and since that time they had lived apart. He stated that he was very devoted to his wife and child. He said that the complaints she had made before he went to Oklahoma went to a temporary matter and he did not apprehend any trouble. He was winding up his business to go to Oklahoma, and she knew that, and that was all the complaint he knew of.

Appellee testified to his assisting his wife in her work about the house, and that he had always done the best he could to help her, entering into detail as to the things he had done. He stated that, like most young lawyers, he had a pretty hard pull, but had always had a good house to live in, "something to eat and plenty to wear, sufficient to go out;" that every dollar he made he spent for the benefit of his family; that his wife and their baby were both sick a good deal, and that he had considerable expense in that regard. He stated that his wife went into the business of canvassing for the sale of dress goods over his protest, but after she persisted in working he did all he could to assist her, stating in detail what he did. He denied that he had ever abused the plaintiff or used insulting language toward her. Stated that they had had some little differences in church matters; that she was a strong Baptist and he a strong Methodist, and they disagreed on those lines sometimes, but there was never any ill-temper manifested so far as he knew. He didn't object to her attending church. They both participated in church discussions, arguing the different religious views, but there was no quarreling, just an argument. Said he had never threatened his wife with personal violence. During their married life he paid every dollar of the grocery bills, doctors' bills and things of that kind, except one doctor's bill that was paid by his wife during his absence. The reason that he had not paid that bill was because he disagreed with the doctor as to the amount due. He denied that he had ever accused his wife of infidelity, and explained in detail, giving his version of the alleged quarrels that the witnesses

had testified to between him and his wife, and stated that he did not regard the discussions they had as unpleasant or in the nature of quarrels. Said they became heated and were engaged in by those with whom he was boarding. Stated that he loved his wife, had always loved her and had a very high respect for her.

While the testimony, both on behalf of the plaintiff and the defendant, is exceedingly voluminous, the above are substantially the facts upon which the court refused the prayer of appellant's complaint for divorce and dismissed the same for want of equity in that respect, but decreed to plaintiff the custody and control of the child. The court also overruled appellant's motion to grant her an attorney's fee.

The appellant duly prosecutes this appeal.

*D. B. Sain,* for appellant.

1. In an action for divorce, it is not necessary that the plaintiff be wholly blameless in order to be entitled to the relief prayed for. 44 Ark. 434, 435. Nor is it essential that the indignities offered should be accompanied with bodily harm, in order to entitle the plaintiff to a divorce.

2. We think the evidence discloses a state of facts sufficient to show that appellant is entitled to a divorce, in view of the long continued abuse and ill-treatment of her by the appellee, rendering her life with him intolerable. 72 Ark. 355; 9 Ark. 507; 33 Ark. 156; 38 Ark. 324; 76 Ark. 28. A false charge of infidelity, accompanied by other wrongful conduct on the part of the husband, where there is no foundation in fact for such charge, justifies a decree for divorce. 104 Ark. 104.

3. The chancellor's finding is against the clear preponderance of the evidence, and should be reversed. 85 Ark. 84; 71 Ark. 605; 77 Ark. 216; 105 Ark. 197; 102 Ark. 663.

*Appellee, pro se.*

Contends that the conduct of the appellee and the language employed by him did not amount to such cru-

elty as is contemplated by the statute and as defined by this court.   76 Ark. 28; 38 Ark. 119; 9 Ark. 507.

The decree dismissing the complaint is supported by the testimony.

WOOD, J., (after stating the facts).   (1)   Appellant testified that appellee accused her of infidelity.  Appellee expressly denied this charge, and appellant is not corroborated as to this.   Hence, no divorce can be granted on that charge.   *Kientz* v. *Kientz,* 104 Ark. 381-384, and cases there cited.

(2)   Much testimony was given by appellant and her witnesses concerning appellee's nonsupport of her and their child, but this is not made a ground of divorce by our statute, and appellee testified that he contributed all that he earned to the support of his wife and child; and that in this regard he did the best he could.

(3-4)   Appellant and her witnesses testified that appellee was "quarrelsome," "abusive" and "insulting" toward her.   General statements of witnesses in the nature of opinions or conclusions are not sufficient.   Specific acts or words must be shown by which the court can determine whether or not the challenged conduct constituted a ground for divorce under our statute.   *Dunn* v. *Dunn,* 114 Ark. 516; *Bell* v. *Bell,* 105 Ark. 194.  True, appellant testified that appellee, while abusing and quarreling at her, would say that "she was crazy."   Even if the use of these words, in connection with the other circumstances, would have been sufficient to warrant a divorce, no witness corroborates appellant as to the use of these words by appellee.   Appellant also testified that appellee, a few days before she left him, threatened her by saying:   "I ought to get a club and fight it out."   This testimony of appellant is corroborated by one witness. But no actual violence was used by appellee on appellant, and one instance of threatened violence would not be sufficient of itself, nor in connection with the other circumstances in proof, to justify a court in sundering the sacred bonds of matrimony.   *Malone* v. *Malone,* 76 Ark. 28-30.

The testimony on behalf of appellant tends to prove that appellee was "nagging" and "fussing" and "quarreling" at her constantly. "The rows they had would continue late in the night and be renewed the next morning." "A good deal of the trouble grew out of the fact that plaintiff wanted to carry the baby to church and defendant objected to it." Whenever she would speak of going to prayer meeting or church he would begin to quarrel at her. "These troubles were continuous between them." Appellee stated that "his wife was a strong Baptist and he was a strong Methodist, that they disagreed on those lines sometimes, but there was never any ill-temper so far as he knew." He stated that both participated in the church discussions, arguing the different religious views; while at times they "became heated, he did not regard them in the nature of quarrels, but only arguments."

It thus appears that the most fruitful source of the disturbances between appellant and appellee was a difference concerning their respective religious creeds. While engaged in these *church controversies,* both for the time seem to have entirely overlooked the fact that "on earth peace, good will toward men," was the mission of Him who founded His church, and who is the Great Exemplar for all her members. They seem, too, not to have profited by the lessons of that Good Book, which contains the revelation of the will of Him whom they professed to follow. For, is it not written therein, "A soft answer turneth away wrath, but grievous words stir up anger?" Prov. 15:1. Again, "Be not hasty in thy spirit to be angry; for anger resteth in the bosoms of fools." Eccl. 2:9. Again, "Be ye angry, and sin not; let not the sun go down upon your wrath." Eph. 4:26.

(5)  While the evidence shows that appellee usually began and was the chief offender in these domestic "discussions" or "quarrels" over denominational differences, yet appellant does not deny, and the testimony shows, that she, at least to some extent, participated therein. "At times both plaintiff and defendant partici-

pated in the quarreling and nagging." "At times they used abusive and insulting language."

In *Malone* v. *Malone, supra,* Chief Justice McCulloch, speaking for the court, said: "To our minds, the testimony shows that both parties were somewhat at fault, and that both, by failure to exercise that mutual forgiveness which the relation demanded, aggravated rather than tended to ameliorate their conjugal state."

(6) Appellant in her testimony says: "That she had no love for the defendant and could not care for a man that had treated her as defendant had." Appellee says that he "loved his wife, had always loved her, and had a very high respect for her." The love and faith that are plighted when parties stand at the marriage altar should "suffer long" and be exceedingly kind. Marriage vows are solemnly assumed, and should be sacredly kept. The interests of society demand that the bonds of wedlock should not be severed, except upon clear proof of one or more of the grounds prescribed by our statute. The quarrels between the parties to this record were most unseemly and deplorable, especially for those who claimed to follow "in His steps." While undoubtedly appellee was more to blame for them, yet it is not shown by specific acts or words that he had exhibited such settled malevolence toward appellant as to justify her in forever abandoning his bed and board. They are not such "indignities to her person" in the sense of our law, as to render her married life intolerable. See *Kientz* v. *Kientz, supra,* and cases there cited.

As the writer once observed, upon somewhat similar facts,

"A little confessed, a little endured,
A little forgiven, and all is cured,"

duly practiced from the first by this now unhappy couple, would have kept closed forever the Pandora's Box of matrimonial sorrows, from which relief is now sought. But relief will not be granted in such cases.

The judgment is therefore affirmed.