## MEFFERT v. MEFFERT.

### Opinion delivered May 24, 1915.

1. DIVORCE—INDIGNITIES—EVIDENCE.—In an action for divorce in determining what indignities to the person are sufficient to render one's condition intolerable, regard must be had to the particular circumstances of each case, and to the mental and physical condition of the party charged.

2. DIVORCE—INDIGNITIES—GROUNDS FOR DIVORCE.—The remedy of absolute divorce contemplated by the fifth subdivision of section 2672 of Kirby's Digest, is for evils which are unavoidable and unendurable and which can not be relieved by any exertions of the party seeking the aid of the courts.

3. DIVORCE—INDIGNITIES—EVIDENCE.—In an action for divorce under the provisions of the fifth subdivision of § 2672 of Kirby's Digest, the evidence held insufficient to warrant the granting of a decree.

4. DIVORCE—CUSTODY OF CHILD.—Where a petition for divorce is denied, but the chancellor awarded the custody of a child of eight

years to the mother, the order is not final, and may be changed at any future time by the chancellor for cause.

5.    DIVORCE—ALIMONY—CHANGED CONDITIONS.—Under Kirby's Digest, § 2683, the chancery court has the power to alter an allowance of alimony at any time when the changed conditions of the parties justifies such action.

Appeal from Benton Chancery Court; *T. H. Humphreys,* Chancellor; affirmed.

*W. N. Ivie,* for appellant.

1.    The father, unless he is incompetent or unfit, is the natural guardian and entitled to the custody and control of his minor children.    Kirby's Dig., § 3757; 32 Ark. 96; 95 Ark. 355; 37 Ark. 30.    Even as against the mother, he is generally allowed the custody of the children.    82 Ark. 461.

2.    The evidence fully makes out a case in favor of the appellant.    Certainly, there could be no greater indignities offered to a man of strong religious convictions than for his wife secretly, and without his consent, to take his children and have them baptized into a religious faith which she knew was repugnant to him, nor a condition more intolerable to such a man than for her to continuously bemean his faith and his church with vile and profane epithets, and that, too, in the presence of the children.    We have a stronger case here than the *Mosher* case, 12 L. R. A. (N. S.) 820, or the *McGee* case, 72 Ark. 355.    See also 85 Ark. 471; 9 Ark. 507; 38 Ark. 119; 44 Ark. 429.

*Appellee, pro se.*

1.    Whether the religious views of the parties are irreconcilable or not, these can not be made the basis of a suit for divorce.    Kirby's Dig., § 2672; 115 Ark. 32.

Adopting the view most favorable to appellant, the most that can be said for him is that his condition has become unpleasant or unhappy, but the evidence falls short of showing that his condition has been rendered intolerable.    Indignities, to be sufficient to constitute a ground for divorce, must be something more than mere matrimo-

nial bickerings and uncongenialities which render the parties unhappy. They must consist of a course of conduct systematically pursued by the offending spouse which evinces a settled feeling of hatred and estrangement toward the other. 104 Ark. 381; 38 Ark. 119; 9 Ark. 507.

If appellee be guilty of all the conduct charged against her, she is not guilty of such indignities as constitute grounds for divorce. 105 Ark. 195; 104 Ark. 381; 53 Ark. 484; 44 Ark. 429.

If the parties are equally at fault, neither party is entitled to divorce. 80 Ark. 451; 77 Ark. 94; 53 Ark. 484.

2. The custody of the children was properly awarded to the mother. Kirby's Dig., § 2681; 85 Ark. 471; 78 Ark. 193; 75 Ark. 22; 29 Cyc. 1588; *Id.* 1596; 86 Ark. 473; 64 Ark. 521.

Hart, J. J. K. Meffert sought a divorce from Emma Meffert on the ground that she had offered such indignities to his person as to render his condition intolerable. From a decree dismissing his petition for divorce and awarding his wife the custody of their young child and allowing her alimony, the plaintiff prosecutes this appeal. It appears from the record that these parties were married November 4, 1903, in Kansas City, Missouri, by a probate judge. The plaintiff was a member of the Methodist Church and the defendant of the Roman Catholic Church. After their marriage they lived in various towns in the States of Missouri and Oklahoma until December, 1911, when the plaintiff moved to Rogers, Arkansas. The defendant joined her husband in February, 1912. Prior to this time three children had been born as fruits of their marriage, two of whom had died. In November, 1912, another son was born who, at the time of the trial, was fifteen months old. The other remaining living child was a little daughter, then eight years old, named Bernice.

On the 29th day of September, 1913, the wife left her husband's home and went to visit her mother in another State. She returned on the 29th of October, 1913, and

this suit was instituted by the husband on the 31st day of October, 1913.

J. K. Meffert testified in his own behalf substantially as follows:

Prior to our marriage my wife agreed that she would renounce the Catholic faith, but after we were married she refused to do so. We lived at various towns in the State of Oklahoma, and in some of these towns I was a member of the choir of the Methodist Church. My wife was jealous of my attention to other women, although I never gave her any cause to be so. After we came to Rogers I to some extent engaged in church work and was a member of the choir of the Methodist Church. My wife became jealous of my attention to several lady members of the choir, but I gave her no cause to be so. She frequently cursed and abused me, calling me a "darn old hypocrite," or a "damn old hypocrite." She seemed to be angered because I went to the Methodist Church and carried our little daughter, Bernice, there. She was extravagant and very neglectful of our home. On September 29, 1913, she left my home and declared that she would never return to live with me. She did return, however, on October 29, 1913, and gave a number of reasons for returning. One of them was that she wanted our little daughter, Bernice, and I refused to let her have her. In a few days I instituted this suit for divorce.

Several servant girls who worked for the parties to this suit while they lived at Rogers testified that the plaintiff was always kind and considerate toward his wife, but that she frequently cursed and abused him, calling him a "darn old hypocrite," or a "damn old hypocrite," and that one of her most frequent expressions was, "un-God." They stated that the plaintiff most of the time bathed and dressed his little daughter and took her to Sunday School; that his wife objected to his doing so and objected to his going to choir practice and church so often. They said that she frequently quarreled with him about his church and religion and used profane and vulgar language to and about him.

The defendant, Emma Meffert, testified in her own behalf substantially as follows:

My husband and I never had any serious quarrels until we came to Rogers. Prior to that time our married life had been a happy one. I have not been very well since the birth of our daughter, Bernice, who is now eight years of age. At the time of our marriage I was twenty-three years old and weighed 110 pounds. I now weigh only eighty pounds. After we came to Rogers and the birth of our son in November, 1912, I got worse and have been ill most of the time since then. I never objected to my husband taking our little daughter to the Methodist Church and Sunday School; but, on the contrary, encouraged it. I felt, however, that he neglected me and his home for his choir practice and his church work. I particularly objected to his attention to one of the female members of the choir and told him so. I never thought there was any criminal intimacy between them and did not charge him with that, but I thought he paid her too much attention for a married man and complained about it. He paid no attention to my complaint. I was not extravagant, and I attended to my household duties the best I could, considering the state of my health. When I left in September, 1913, I had no intention of staying away, but went to visit my mother. When I returned home I asked my husband if he was glad to see me, and he replied that he was not, pushed me away from him, and said that I better go back to Kansas. My mother lived there. I then asked him what about Bernice, and he said that he had an old lady who was coming to keep house for him. I told him that I would not leave, and he replied that the law would make me go. Subsequently, he served notice on me and my brother, who had come with me to vacate the house. I never used profane or vulgar language toward or about him. At times when I was excited I may have used the phrase "un-God." I had trouble with most of the servant girls who stayed with me after I came to Rogers, but this was due to the manner in which they did their work.

Other witnesses, who belonged to the Methodist and Presbyterian churches, testified that they lived near the home of the parties to this suit and visited Mrs. Meffert frequently. They said that she did not use profane or vulgar language, but that she at all times conducted herself as a good wife. That she was not extravagant and did not even dress as well as her husband; and that she was nervous and excitable because she had been ill ever since the birth of her son in November, 1912.

One of these witnesses stated that at the time she left in September, 1913, she stated that she was just going home on a visit. Others stated that Mr. Meffert was frequently seen on the streets with one of the members of the choir, and that this was a source of great worry and annoyance to his wife. One of them stated that on one occasion shortly after the baby was born she was called over to attend Mrs. Meffert, who was very ill at the time, and that while there she saw Mr. Meffert walk by the house with this member of the choir and that he did not stop to inquire about his wife.

Another of the witnesses stated that she and Mrs. Meffert, while walking on the streets one day, saw Mr. Meffert and the member of the choir, above referred to, talking. Mr. Meffert left before they came up and Mrs. Meffert said to the young lady, "It is funny to me that I never see you without you are talking to my husband," and the young lady answered, "Maybe you don't like it?" Then Mrs. Meffert said, "No, I don't like it," and the young lady again replied, "You surely don't trust him."

A physician who had attended Mrs. Meffert for about a year prior to the time he testified said she had during all that time been in a very nervous condition and that he had several times feared she would break down with nervous prostration. He testified that her condition rendered her highly excitable and that she was at all times very nervous.

(1) The record in this case is very long and other matters testified to by the various witnesses might be set out at great length, but we do not think a detailed state-

ment of the evidence or a specific review of it would be of any value to the parties to this suit or be of any use to future actions as a precedent. For in determining what indignities to the person are sufficient to render one's condition intolerable, regard must be had to the particular circumstances of each case and to the mental and physical condition of the party charged.

(2) This action was brought under the fifth subdivision of section 2672 of Kirby's Digest. In discussing the provisions of the latter clause of that section in the case of *Cate* v. *Cate,* 53 Ark. 484, Chief Justice COCKRILL said:

"The latter provision does not require that a party shall show that she, or he, lives in a state of danger or apprehension of personal violence, in order to warrant judicial interference. *Haley* v. *Haley,* 44 Ark. 429. But the courts are not quick to interfere in domestic quarrels, and where the parties are equally at fault, it must be shown at least that there is something that makes cohabitation unsafe, to move the courts to interfere. Unhappiness sufficient to render the condition of both parties intolerable may arise from the mutual neglect of the conjugal duties; but when the parties are thus at fault the remedy must be sought by them, not in the courts, but in the reformation of their conduct. The remedy is in their own hands, and, until it has been tried without effect by the party complaining, the court will not give effect to the complaint. Until this home remedy has been tested and failed, the condition of each may be said to be due to his or her own acts, and one must bear the consequences of his own misconduct." See, also, *Arnold* v. *Arnold,* 170 S. W. Rep. 486; 115 Ark. 32.

So it may be said that the remedy of absolute divorce contemplated by this clause of our statute is for evils which are unavoidable and unendurable and which can not be relieved by any exertions of the party seeking the aid of the courts. In *Hoff* v. *Hoff,* 48 Mich. 281, 12 N. W. 160, Mr. Justice Cooley said:

"It is true of divorce cases, as in others, that a party must come into a court of equity with clean hands. Divorce laws are made to give relief to the innocent and not to the guilty."

We have read the long record in this case with much care, and have come to the conclusion that when the evidence is stripped of the insinuations and innuendoes of the parties and their witnesses, it falls short of making a case in favor of the plaintiff. The plaintiff testified that his wife had always been of a jealous disposition and had been jealous of his harmless attentions to women before they came to Rogers. His wife denied this. She said their married life had been happy until they came to Rogers. Be that as it may, there is no testimony tending to corroborate the husband as to what occurred before the parties moved to Rogers, and his right to relief must be predicated upon the occurrences at Rogers. The record shows that after they came to Rogers their married life was not a happy one. Each party, as is usual in such cases, laid the blame on the other. The husband testified that the wife neglected their home; that she was extravagant and seriously objected to his church connection; and that she objected to his taking his little girl to church and Sunday School. He testified that she sneered at his religion and studiously adopted a contemptuous manner toward him. His testimony is corroborated in a general way by the various servants who worked for them during this time. But when the testimony is analyzed we think it falls far short of establishing the contention of the plaintiff.

For instance, on one occasion, according to the record, they had a violent quarrel about their religion, but it came up in this way: A neighbor's servant girl, who belonged to the Catholic Church, was visiting their servant girl, who was a member of the Methodist Church. The servant girl of the parties to this suit made some very derogatory remarks about the priests of the Catholic Church. This angered the defendant, and she began to upbraid the servant for it. The husband took the part

of the servant, and said she had a right to say what she pleased.

At other times the wife made harsh remarks about the husband, but for the most part it was because she objected to his attention to a member of the choir and to his refusal to cease such attention. She admits that on several occasions she called him a "darn old hypocrite," and says that she did this because of something he had said which angered her. She admits that she was very nervous and easily excited, but denies that when she left home in September, 1913, she had no intention of returning, but, on the contrary, said it was her intention to return home and to live with her husband.

Instead of being an extravagant woman, as her husband testified, her neighbors testified that she was a frugal one, and that her husband dressed very much better than she did. They also said that instead of being a coarse and vulgar woman, her conduct was always exemplary, and that there was nothing about her life which indicated that she was accustomed to use profane or vulgar language.

According to the testimony of defendant and her witnesses, she did not object to their little daughter going to church and Sunday School, but on the contrary encouraged her to do so.

When the whole situation is summed up and the surrounding circumstances taken into consideration, it seems that the parties to this suit were in the habit of quarreling frequently but that these quarrels were due to their differences in religion and to the fact that the wife objected to his paying too much attention to a member of the choir.

The record shows that the husband was a strong, healthy man, and that the wife was a weak, nervous woman, easily excited. They both seemed to be devoted to their daughter, and they do not seem to have any settled dislike for each other. There appears to have been nothing in the conduct of the husband with the member of the choir referred to in this record other than that which may

be characterized under the well known term, ''flirting.'' Still, the husband persisted in his attention to her after he knew that his wife objected to it. He knew that his wife's condition was such that she was easily excited, and, under the circumstances, he should have refrained from paying any further attention to another woman but should have devoted his life to his wife and children.

If the parties had practiced the principles of their religion, instead of talking about them so much, it is probable that their family differences would have adjusted themselves. Under their marriage vows it was their duty to exercise mutual forbearance and tolerance of the faults of each and to bear the burdens incident to the marriage relation and to life itself.

Neither of the parties to this suit is vicious or immoral. As above stated, they both seem to be devoted to their little daughter, and there seems to be no substantial reason why they may not live together in peace if not in happiness. The record does not show anything in the life of either of these parties which makes it impracticable for them to again live together.

(3) The chancellor found the issues in regard to the divorce in favor of the defendant, and, when the whole record is considered, we are of the opinion that his finding is not against the preponderance of the testimony.

The chancellor also awarded the custody of the daughter to the mother. At the time the case was heard and determined by the chancellor Bernice was eight years old. The testimony shows that both of her parents were devoted to her and that prior to the unhappy condition brought about by this suit she was very devoted to both her parents. Considering her tender age, and the fact that she needs a mother's care, we do not think the chancellor erred in awarding her custody to the mother.

The father was given the right to visit the child at all proper times, and she may be the means of bringing about a reconciliation between them.

(4) It must be remembered, however, that the order of the court awarding the child to the mother is not a final

one, and that it may be changed at any future time by the chancellor for cause. It then behooves the parties to this suit to teach the child to love and respect both its parents. If either of the parents should try to teach the child disrespect to the other, this course, if persisted in, might be a ground for the chancellor to change the custody of the child if the mother should be the guilty party; or to restrict the visits of the father, should he be in fault in that respect.

The record shows that the husband is in debt about $1,300; that he was agent of the railway company at Rogers and that his salary was $125 per month. The court awarded to the defendant the sum of $65 per month alimony. Under the circumstances, we can not say that the chancellor erred. The husband is a stout, robust man, in the prime of life, and the wife is a weak, nervous woman, who, while devoted to her two children and capable of taking care of them, is not capable of earning any money by her own exertions.

It is the duty of the husband to support his family; but it is equally the duty of the family to reside with him. The award of alimony made by the chancellor is subject to alteration under changed conditions.

The record shows that the husband ordered his wife out of the house after she returned from a visit to her mother in the fall of 1913. He claims that he had good reasons for doing so, but the court has held otherwise. His wife said she had come home to again live with her husband, and it is her duty to do so if he should honestly and in good faith repent and ask her to come home again.

(5) Section 2683 of Kirby's Digest provides that upon the application of either party, the court may make such alterations from time to time as to the allowance of alimony and maintenance as may be proper. Under this clause of our statute, the court has the power to alter the allowance of alimony at any time when the changed conditions of the parties justify such action. *Pryor* v. *Pryor*, 88 Ark. 302.

The decree will be affirmed.