ALSTON *v.* ALSTON.

4-3498

Opinion delivered July 9, 1934.

*Abe Collins,* for appellant.

*Lake, Lake & Carlton,* for appellee.

MEHAFFY, J. The appellee, Bess Alston, and the appellant, Roy Alston, were married October 12, 1915, and lived together as husband and wife until June 1, 1933,

practically 18 years. On September 14, 1933, the appellee filed in the Sevier Chancery Court a suit for divorce on the grounds of indignities. She alleged the indignities as follows: "Treating her with rudeness, vulgarity, unmerited reproach, haughtiness, contempt, contumely, manifest disdain, abusive language, malignant ridicule, intentional incivility and studied neglect, habitually and systematically pursued. That his manner toward her had been repeatedly persistently unkind. That he withdrew from her all confidence. That his conduct toward her indicated plain manifestation of settled hate, alienation and estrangement, both of word and action." That such course of conduct upon the part of the defendant commenced some three or four years ago, and has grown in intensity and severity since that time until it finally became impossible for her to longer live with him.

It will be observed that the complaint does not state any facts, but states mere conclusions based on the statute, without any attempt to set out what the facts are, or when they occurred, other than stating that the course of conduct commenced three or four years ago.

"The indignities of which she complained should have been specifically set out, that it might have been seen whether they were such as to render her condition intolerable as alleged, or a sufficient cause for the divorce she sought." *Brown* v. *Brown,* 38 Ark. 324; *Waldren* v. *Waldren,* 187 Ark. 1077, 63 S. W. (2d) 845.

We said in the case last mentioned: "An allegation such as the one in appellee's complaint would be sufficient to support a decree where no motion to make more specific was filed, if the evidence had been as to specific facts or specific acts of appellant instead of mere conclusions.

"Where one brings suit for divorce alleging indignities and misconduct, as the appellee did in this case, the defendant of course would be entitled to know what the plaintiff claimed were the facts constituting the indignities, and if a motion was made to make more specific, the court would require the plaintiff to set out the facts."

The appellee testified about the date of the marriage and the date when she left the appellant; that they had

one little girl nine years of age who is with her, except week-end visits to her father; that Mr. Alston made a visit to Vicksburg, Mississippi, in July, and since then they have not lived together as husband and wife; that Mr. Alston is in the mercantile business; he was gone to Vicksburg about ten days, and appellee did not hear from him during that time; did not know when he came back, and when he came back he did not call her up or notify her; the first she knew about his coming back was on Wednesday after he came back on Monday. Appellee, when appellant went to Vicksburg, stayed at her mother's, and was there when he returned. She was at her mother's and went out to get some water, and appellant was on the roof of the new home that her mother was building, and when she saw him she said, ''Hello,'' and he said ''Good morning,'' and that was all that was said. He stayed there about five or ten minutes after speaking to her. He did not say anything about the appellee's going home, and did not call or send for her after he got home. She went home and took her daughter, Joy, and when they got home appellant just looked ugly, and did not have anything to say to her; that they had a bedroom and a sleeping porch, with a door between, and the door had always been left open. That night he closed the door and did not have anything to say. She did not open the door that night. A few nights after that when Joy was away, she opened the door and thought she would joke with him. He was out of tune, and she thought he would get in a better frame of mind. She told him she was lonesome, and asked him why he did not open the door, but he did not answer or look at her, and she closed the door.

Appellee and Joy were in an automobile accident in August. When she tried to talk to appellant, the chances were he would get his hat and go to the store. He was never in a good humor, never undertook to have a pleasant conversation or cohabit with her as husband and wife. The little girl was badly hurt in the accident and appellee was injured. Joy was rendered unconscious. Appellee's back and knee were hurt. The bus driver took her to the hospital and her

husband got in the front seat. She and Joy were in the back seat. Appellant did not say anything to her, but just looked ugly. He did not ask appellee if she were hurt. The bus driver asked her to explain how the accident occurred. Appellant did not ask the doctor in her presence about the extent of her injuries. She thinks he did not even know she was hurt; thinks he was still pretty mad at her. She was suffering, she said, and the doctor gave her a hypodermic. Appellant sat right over Joy all the time, and when the nurse came in to take Joy's temperature, appellant said to her, pointing over her shoulder: "She's the one that is making the racket."

She told appellant that she was going to the hospital at Texarkana, and he did not make any arrangements for her to go. When she told him she was going, he said: "Who said so, your mamma?" She told appellant that she had had X-ray pictures made. He just listened and did not say anything. He just had a look of disdain—just an ugly look that he has for witness.

Appellant said to her, at a time she had gone to De-Queen for some dental work, that he was getting mighty tired of this, and asked her when she was going to get her lawyers and get a divorce. She told him that if he wanted to talk about it they would talk then, but he said: "No, your aunt is out there. Go on."

Appellee then testified about some conversations with her brother and her father, and then said that appellant told her she was not a nice girl when he married her, and asked her if she had not had dealings with so and so. She also testified that when some lady came into the room and asked appellant how appellee's knee was, he said: "I do not know what the doctor said about her knee. He has been in there looking at her leg for 30 minutes."

Appellee testified that, after they had been married about two years, he employed Miss Pearl Rogers to work in the store, and she wanted him to get rid of Miss Rogers, and he finally did. She then said that appellant did not like Mr. Custer Hughes, but that she had known Hughes always. That appellant often got his gun and

would take a walk with it. She testified about their going to the country club when appellant did not want to go. She also testified about a diary she said appellant kept, and she complained about it and said it was such trash; that appellant did not confide in her with reference to his business matters.

She left her husband about September 12th and did not presume he wanted her to come back; that he never let any one hear him say very cruel remarks. There was some disagreement about the purchase of a piano for Joy. She also admitted that she told appellant when the baby was born that she was going to teach her to dislike him.

When appellee was asked on cross-examination if it was not a fact that every time Custer Hughes would come around the house he would grab her and kiss her and put his arms around her, she answered: "Don't you know Custer Hughes well enough to know that he does that with a good many other women?" She said that at one time appellant called her a liar.

The above is substantially the testimony of appellee. She introduced O. C. Kirby, her father, and Mrs. Sarah Graves, but neither of these witnesses introduced by her testified to any facts in corroboration of appellee's testimony.

We do not set out the testimony of appellant because, as we view the testimony of appellee, there is not sufficient evidence to justify the granting of a decree, and appellant does not ask for a divorce. The appellant denied all the appellee's testimony.

There is very little evidence as to facts constituting indignities. The evidence about appellant's looking ugly and treating appellee with disdain are merely conclusions, and no facts are testified to with reference to these matters. The evidence of appellee is without sufficient corroboration.

We recently said: "It is the established doctrine in this State that a divorce decree will not be granted upon the uncorroborated testimony of one of the parties." *Sutherland* v. *Sutherland*, 188 Ark. 955, 68 S. W.

(2d) 1022; *Darrow* v. *Darrow*, 122 Ark. 346, 183 S. W. 746; *Johnson* v. *Johnson*, 122 Ark. 276, 182 S. W. 897; *Arnold* v. *Arnold*, 115 Ark. 32, 170 S. W. 486; *Kientz* v. *Kientz*, 104 Ark. 381, 149 S. W. 86; *Rie* v. *Rie*, 34 Ark. 37; *Preas* v. *Preas*, 67 S. W. (2d) 1013.

In 2 Nelson on Divorce and Separation, page 742, the rule as to corroboration is discussed, and, among other things it is said: "If both parties testify, and the defendant denies all the plaintiff's testimony, the evidence is insufficient. In such cases, however, the court must be careful to notice the character of both parties, and the consistency of the testimony, and may refuse a decree if the evidence is not satisfactory. In New Jersey and Arkansas and perhaps other States, the courts have required corroborative evidence for so long a time that the rule has acquired almost the effect of a statute."

In Keezer on Marriage and Divorce, page 361, it is stated: "While there is no general rule aside from the statute, requiring corroboration, courts are so reluctant to decide cases on such evidence, that it amounts to nearly the same thing, and evidence of the parties should be corroborated, if possible." To support this rule, several Arkansas cases are cited.

Our conclusion is that there was not sufficient evidence to justify the granting of a decree, and the decree therefore must be reversed, and the cause dismissed.

It is so ordered.