FANIA *v.* FANIA.

4-5670                                      133 S. W. 2d 654

Opinion delivered November 27, 1939.

*Karol A. Korngold* and *Rose, Loughborough, Dobyns & House,* for appellant.

HOLT, J.   Mrs. Stephanie Fania, appellant, brings this appeal from a decree of the Pulaski chancery court in which her husband, appellee, was awarded a divorce on the ground of desertion.

It is alleged in appellee's complaint that he and appellant were married in St. Louis, Missouri, in September, 1923, and lived together until about four years ago, at which time appellant deserted him without reasonable cause.   It is further alleged that four children were born to this marriage, now aged, respectively, fourteen, thirteen, eleven, and eight, and that said children are now in the care and custody of appellant and that she is the proper person to have said custody.

The answer of appellant denied every material allegation in the complaint.

We think it would serve no useful purpose to set out the testimony in this case at any great length.   Briefly, however, it is to the following effect:

Appellee, Frank V. Fania, until coming to Arkansas and establishing his residence here for the purpose of filing suit for divorce, was, and is at the present time, a resident of St. Louis, Missouri.   Appellant since 1929 has been and still is a resident of Ironton, Missouri.

These parties separated in the early part of 1934 and appellee thereafter paid no visits to his wife and children in Ironton.

Since the separation, appellant has had the custody of the four minor children which were born to these parties, and with $25 a month, one-half of appellee's government pension, and moneys that she was enabled to earn as a social worker and as a trained nurse, appellant has succeeded in caring for the children and herself.

Appellee was formerly an assistant prosecuting attorney in the city of St. Louis.   While holding that office, he procured a home in Ironton and took his family there in 1929.   He spent his Saturdays and Sundays with

his family. He lost his assistant's position and for a while spent more time in Ironton. He severed all relations with appellant in 1934 and decided "to strike out for himself." At that time he went to live with his mother and sisters in St. Louis and was supported by his friends. He testified that he tried to get his wife and family to 'come to St. Louis, take rooms and "try to make it" on the $50 a month allowance he was getting from the government.

Appellant urged him to return to his family in Ironton and tried to secure employment for him there. Appellee refused her request to return, and has contributed nothing toward the support of his family since their separation in 1934 except one-half of his government pension.

Appellee made two unsuccessful attempts to obtain a divorce from appellant in the state of Missouri before bringing suit in Arkansas.

The learned chancellor granted appellee a divorce on the ground of desertion and awarded appellant $50 a month alimony and the care and custody of the four minor children.

Appellant very earnestly insists here that the evidence in this record is not sufficient to sustain the decree for lack of corroboration, and we are of the view that this contention must be sustained.

While it is true that appellee testified that his wife deserted him by refusing to join him in St. Louis, the appellant testified that she had always been willing to join the appellee wherever he might go. After a careful review of the testimony we are of the view that the overwhelming weight of the testimony sustains and corroborates appellant's evidence on this question of desertion.

While appellee says he wanted his family to join him in St. Louis in the early part of 1935, yet his own testimony shows that he had lost out in the practice of law, had not practiced since 1934, had no income other than the $50 per month pension, was living off of loans from his friends and in the home of relatives, and to quote from his own testimony:

"Q. You say it was about 1935 and that you finally severed all relations with Mrs. Fania and decided to strike out for yourself? A. Yes, sir—oh, about the latter part of 1934. Q. You say at that time you were living with your mother, and your sisters and your friends were supporting you? A. That is practically true. Q. And you requested your family to join you in St. Louis and told them you were not coming back to Ironton? A. I told them if they would come up, there would be an opportunity to cut the expense down, and come to St. Louis and get three or four rooms, or two, and we could make it on my $50 a month—yes. Q. That was in 1935? A. Oh, I wouldn't be exact—somewhere around there—the latter part of 1934, or 1935. Q. That was when you were out of employment and had no money and when you were living on your relatives, yourself? A. I still had that $50 a month coming in, and I think if they had had any feeling for me they would have come up there and tried to make it go."

In answer to this testimony his wife testified: "Q. He testified he wanted you to bring the children to St. Louis and reduce expenses? A. He never said that at any time. Q. Would you have gone to him had he requested you? A. Very gladly. Q. Did he give you any opportunity to ever rejoin him after 1934? A. No, Mr. House, he did not."

In an effort to corroborate his own testimony appellee introduced but one witness, his mother, Mrs. Lucy Fania. An examination of her testimony, however, clearly shows that it does not measure up to that kind of corroborative testimony which the law requires, for the reason that we think it undisputed on this record that her testimony, given to support the alleged efforts of appellee to persuade appellant to join him in St. Louis in the early part of 1935, related to conversations of appellant which took place in 1931. Certainly conversations in 1931 could have no probative value in determining whether the appellant refused to follow the appellee to St. Louis in 1935. No rule is better settled in this state than that a divorce cannot be granted on the uncorroborated testimony of the moving party.

In the case of *Welborn v. Welborn,* 189 Ark. 1063, 76 S. W. 2d 98, this court said: "Appellee was awarded a decree of divorce, and . this appeal is prosecuted therefrom. Were it conceded, which we do not for the reasons hereinafter expressed, that appellee's testimony was sufficient to establish cause for divorce, this would fall far short of complying with the prevailing rule in this state that a divorce will not be granted upon the uncorroborated testimony or admissions of either spouse. *Rie v. Rie,* 34 Ark. 37; *Kurtz v. Kurtz,* 38 Ark. 119; *Scarborough v. Scarborough,* 54 Ark. 20, 14 S. W. 1098; *Kientz v. Kientz,* 104 Ark. 381, 149 S. W. 86; *Arnold v. Arnold,* 115 Ark. 32, 170 S. W. 486. The testimony of appellee's witnesses heretofore set out demonstrates its lack of corroborative facts and circumstances, and we have no hesitancy in holding its insufficiency."

We are of the view that the preponderance of the testimony in this case is not only against appellee, but in fact, sustains the version of appellant. The testimony of many disinterested witnesses shows that apppellant did not desert appellee.

The general rule controlling with respect to divorce actions in this state has been well stated in the case of *Arnold v. Arnold,* 115 Ark. 32, 170 S. W. 486, as follows: "Marriage vows are solemnly assumed, and should be sacredly kept. The interests of society demand that the bonds of wedlock should not be severed, except upon clear proof of one or more of the grounds prescribed by our statute."

While it may be that the parties to this action may never become reconciled and live together again, although, as we view the testimony, the door is far from being closed to their again becoming reunited, we think it far more important to the interest of society that the marriage contract should not be severed except upon clear proof of one or more of the grounds prescribed by our statute.

In *Davis v. Davis,* 163 Ark. 263, 259 S. W. 751, this court said: "The learned counsel for the appellee urged to the effect that the record, as a whole, shows the utter incompatibility of the appellant and the appel-

lee and the futility of any hope of future reconciliation, and that to deny him a divorce under such circumstances, which, they contend, indicate 'a continued and enduring estrangement, suspicion and alienation from the appellee, which has finally culminated in a settled hate, would be merely to force upon the appellee the indefinite continuance of an intolerable condition which no sound public policy demands.' We cannot concur in these views. The ease and frequency with which divorces are so often obtained as a matter of expediency to the individuals concerned is not only a menace to orderly society, but also in it lurks one of the dangers to the stability of our great republic. For one of the foundation pillars of our government is the sanctity of the marriage relation and the influences of the home life, where the holy bond of wedlock is looked upon with profound reverence and respect, and where the marriage vows are sedulously observed. As was said in *Arnold* v. *Arnold,* 115 Ark. 32, 170 S. W. 486, 'The love and faith that are plighted when parties stand at the marriage altar should suffer long and be exceedingly kind. Marriage vows are solemnly assumed, and should be sacredly kept. The interests of society demand that the bonds of wedlock should not be severed except upon clear proof of one or more of the grounds prescribed by our statute'."

For the error indicated, the decree of the trial court will be reversed, and the cause remanded with directions to dismiss appellee's complaint for want of equity.