Poe *v.* Poe.

Opinion delivered May 30, 1921.

1. DIVORCE—CRUELTY AND INDIGNITIES.—The remedy of divorce for cruelty and for indignities to the person, provided by Crawford & Moses' Digest, § 3500, is intended for evils which are unavoidable and unendurable, and which can not be relieved by reasonable exertion by the parties.

2. DIVORCE—CRUELTY TOWARD STEPCHILD.—A husband is not entitled to a divorce on acount of his wife's cruelty toward his children by a former wife where it appears that her cruelty is not habitual nor exercised with the intent of causing suffering to the husband.

3. DIVORCE—ALLOWANCE OF ALIMONY.—An allowance of alimony to a wife, in the absence of any showing that it was excessive, will be presumed to be fair, and will not be disturbed until the changed conditions of the parties render alteration or modification necessary.

Appeal from Garland Chancery Court; *J. P. Henderson,* Chancellor; affirmed.

STATEMENT OF FACTS.

H. E. Poe brought this suit against his wife, Laura Poe, to obtain a divorce on the statutory grounds of cruel and barbarous treatment endangering his life and of such indignities offered to his person as render his condition in life intolerable.

The wife denied the allegations of the complaint and asked for alimony.

It appears from the record that the first wife of the plaintiff was killed in a cyclone, and that some of their children were injured so badly that they were carried to a hospital for treatment. The defendant was a nurse in the hospital and nursed the plaintiff's children while there. This led to the plaintiff's hiring her to become his housekeeper. She went to his home as housekeeper and remained there in that capacity until their marriage about two years after they first became acquainted.

Edgar Poe, the oldest son of the plaintiff, was a witness for him. According to his testimony, he was thirteen years of age, and during most of the time that plaintiff and defendant lived together as husband and wife the latter treated the children well. Sometimes she would whip them and sometimes she would make them do without their dinner. Sometimes they had been doing wrong and sometimes they had not when she punished them. She struck the witness four or five times with something other than a switch. She hit him once with a shovel and once with a stick of stove wood. One time she hit him in the mouth and knocked six of his teeth loose, and it was about a month before his mouth got well. The defendant was a Seventh Day Adventist and

would not let the children do any work on Saturday, but sometimes attempted to make them work on Sunday. At one time his stepmother bruised his face and eye when she attempted to correct him, and also choked him so that she left her finger prints on his throat when she got through. All the matters testified to happened while the plaintiff was away from home.

Albert Poe, the second son of the plaintiff, testified that most of the time their stepmother treated the children well, but that she whipped them with the first thing she could get her hands on; that she would get mad quickly, and at one time got mad and tied him and his older brother with a rope; that his father was out in the back yard when this was done. He also corroborated the testimony of his brother about their stepmother hitting him in the mouth with a shovel and knocking six of his front teeth loose. The teeth became tight again in about a month.

The plaintiff was a witness for himself. According to his testimony a great many Seventh Day Adventist preachers called at his home, and he objected to this. His wife was good to her stepchildren the greater part of the time, but when she got mad she used no judgment and would whip them with anything that she got her hands on. She could not control her temper. He was not present at any time when she abused the children, except once when she tied two of them with a rope. He went into the house and cut the rope. His oldest son, Edgar, left home while the plaintiff was absent because he could not get along with his stepmother. The defendant wrote the plaintiff about this and said that Edgar had run away. She said in her letter that she did not think the matter was serious, but that she had not seen Edgar since he left. Edgar went to his aunt's home when he left. The plaintiff went to see Edgar before he returned home. When he got home he asked his wife what she meant by treating his children the way she did while he was gone. He told his wife that it looked like she could not get along

with his children while he was away. His wife told him that it was all Edgar's fault, and that she had not hurt him. The plaintiff then told her that they would have to move from the country into town because his work was in town. The defendant said that she would not go to town with him, and then he took his children to their aunt's and left home. This was in May, 1919, and the plaintiff and the defendant have not lived together since. The plaintiff made no effort to find any particular place to live, but told the defendant that if she wanted to go to town that he would find a place, but it was on the condition that she would treat the children better. He further stated that she had never offered to go back to him.

On cross-examination he admitted that he had been keeping company with other women since he and his wife had separated. He further admitted that he could not afford to take his wife back the way his children felt about her. He also stated that there was no possible chance for him and his wife to ever live together and get along, and that he was afraid to trust his children with her. His children showed great distress at being carried back to the defendant, and he did not have the heart to do this.

Two other witnesses for the plaintiff testified that they had worked at the plaintiff's house and had seen the defendant whip the children "awful hard." One of them said that the husband would bring home meat to be cooked and that the defendant refused to cook it because it was against her religion to eat meat. She would only feed them on milk, potatoes and bread.

The defendant was a witness for herself. She admitted tying the two boys together one time with a rope, but said that she was playing with them. She denied positively that she had whipped the children severely as testified to by them. She said that she had only whipped them moderately for the purpose of correcting them, and had required them to do but little work on Sunday. She stated that the plaintiff had left their home in the country

in May, 1919, and had wilfully remained away ever since. She continued to reside at their home after the plaintiff had left for nearly a year and left there because her husband came home during her absence and took the furniture out of the house. She stated that she had always treated her husband kindly and still wanted to make up and live with him. He left her on account of her alleged mistreatment of his children. She denied having mistreated them and asked him not to leave her. Her testimony was corroborated by that of her mother, who had made frequent and lengthy visits at their home while they lived together as husband and wife.

Several other witnesses in the neighborhood testified that they visited the home of the plaintiff and defendant frequently, and that the defendant always treated the plaintiff well and never cruelly whipped or mistreated his children.

The chancellor found the issues in favor of the defendant, and dismissed the plaintiff's complaint for want of equity. He allowed the defendant alimony in the sum of $20 per month until further orders of the court.

A decree was entered of record according to the findings of the chancellor, and to reverse that decree the plaintiff has prosecuted this appeal.

*James E. Hogue,* for appellant.

It was error to dismiss the plaintiff's bill for divorce. In those States where the courts have held the abuse of stepchildren is not a cause for divorce, the decisions were rendered under the common-law unaffected by statutes. 9 Ark. 507-516. Besides the abuse of appellant's children was the principal indignity complained of, yet there were others rendering his condition intolerable and entitled him to a divorce under our statute. C. & M. Digest, § 3500.

*A. J. Murphy,* for appellee.

HART, J. (after stating the facts). The grounds for divorce are statutory merely. Among other causes our

statute provides that the chancery court shall have power to dissolve and set aside a marriage contract where either party shall be guilty of such cruel and barbarous treatment as to endanger the life of the other, or shall offer such indignities to the person of the other as shall render his or her condition intolerable.   Crawford & Moses' Digest, § 3500.

In the first place, it may be said that the remedy of divorce, under this clause of our statute, is for evils which are unavoidable and unendurable, and which can not be relieved by reasonable exertion by the parties seeking the aid of the courts.  *Meffert* v. *Meffert,* 118 Ark. 582.

In the second place, it may be said that the main grounds relied upon by the plaintiff in support of his bill for divorce is cruel treatment by his wife to his children by his first wife.

In discussing similar statutes, it is generally held by text writers that mistreatment of a stepchild in itself alone will not afford grounds for a divorce.   It is only where the cruelty toward the child is habitual or exercised with the intent of causing suffering to the parent that a cause of divorce on this account will arise.  Bishop on Marriage, Divorce and Separation, § 1586; Nelson on Divorce and Separation, § 301; 9 R. C. L., § 129, p. 347; 19 C. J., p. 50; *Barker* v. *Barker* (Okla.), 26 L. R. A. (N. S.) 909; *Friend* v. *Friend,* 53 Mich. 543; *Melvin* v. *Melvin,* 130 Penn. St. Repts., p. 6, and *Rigsby* v. *Rigsby,* 82 Ark. 278.

The stepmother might be guilty of great cruelty to her stepchildren, and yet not be guilty in that respect to her husband.  This is well illustrated in the present case.  According to the testimony of the children and of the father, the stepmother had a very violent temper which she could not control, and when she got mad she would whip them with the first thing she got her hands on.  The whippings were all done in the absence of the husband, and, according to the testimony of the children themselves, their stepmother whipped them only when

she became mad at them. The stepmother denies having whipped them too severely at any time. If the testimony of the children is to be accepted, it does not show that the stepmother whipped them because she was mad at their father and intended by so doing to make him suffer. The children testified that for the most part she treated them kindly. So it may be said that the plaintiff has failed in the respect just set forth to establish any grounds for divorce under the statute. The testimony showed that, on account of their difference in religion, the mistreatment of plaintiff's children by his first wife by the defendant and from other causes, their marriage was an unhappy one. Our statute, however, has not made these things a ground of divorce, and the parties must bear the consequences of having made an unwise marriage.

Therefore the chancellor was right in dismissing the plaintiff's complaint for want of equity.

No point is specially made on the fact that the chancellor allowed the defendant alimony in the sum of $20 per month. This allowance was in the usual form, "until the further orders of the court." It does not appear from the record that the allowance was too much. In the absence of any showing to that effect, it must be presumed that the allowance was fair, and it will not be disturbed until the changed condition of the parties makes it necessary for the chancellor to alter or modify it.

It follows that the decree must be affirmed.