LANGSTON *v.* HUGHES.,

Opinion delivered January 25, 1926.

1. LOST INSTRUMENT—BURDEN OF PROOF.—The burden is upon one who claims title under an alleged lost instrument to establish the execution, contents and loss thereof by the clearest, most conclusive and satisfactory proof.

2. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDINGS.—Findings of fact by a chancellor are reversed only where they are clearly against the preponderance of the evidence.

3. EQUITY—LACHES.—Though plaintiffs claimed a legal title to land, yet, when they voluntarily went into chancery, and asked affirmative relief which only a court of equity could grant, the defense of laches is available against them.

4. EQUITY—LACHES.—Where plaintiffs were apprised of defendant's claim of ownership of land and that he was paying the taxes thereon, and they waited 15 years without offering to pay the taxes or challenging plaintiff's ownership, and until oil and gas leases and assignments thereof to various persons had taken place, plaintiffs were barred by laches.

Appeal from Ouachita Chancery Court, First Division; *J. Y. Stephens,* Chancellor; affirmed.

*Powell, Smead & Knox, Haynie & Westfall, A. L. Kayser, D. M. Short & Sons, O. R. Sholars* and *Gibson & Lovett,* for appellant.

*Gaughan & Sifford* and *Streett & Streett,* for appellee.

WOOD, J. This lawsuit, in the last analysis, involves the title to the fractional SE ¼ of the SE¼ of section 21, township 15 south, range 16 west, in Ouachita County, Arkansas. The appellants claim title as the heirs and lineal descendants of William G. Johnson, who died about the year 1862, seized and possessed of all the lands in controversy. The appellees claim title to the lands by adverse possession through James W. Hughes and his grantors for more than seven years prior to the filing of the complaint in this action. The appellees also claim that the appellants are barred by laches from maintaining the action. As a basis for their claim of title by limitation, the appellees alleged that

James W. Hughes acquired title to the lands from Martha J. Cramer, who acquired title by deed from Lavinia Johnson, and that Lavinia Johnson acquired title by deed from Sherman C. Wakefield, the patentee of the Government. They alleged that all of these deeds had been lost or misplaced, that same had never been recorded, and that the appellees were unable to present copies thereof; that Hughes and his predecessors in title took possession of the land, and had been in possession under their respective deeds, for more than seven years prior to the institution of this action.

On the issue of title by limitation, Mrs. Janet Hughes testified that her husband, J. W. Hughes, took possession of the land about 1902. He held possession of same until he died in 1918. After his death witness and her children held possession until the time of the oil boom. Witness was sure that her husband had a deed to the lands in controversy. He spoke to her about it several times. Witness was sure that she saw the deed. Witness had searched for the deed everywhere she could think of, but thought it was lost when her husband carried his deeds to Camden to have the first abstract made. Since the controversy arose her youngest son had also searched for the deed. The deeds were kept in a box in a trunk, and witness had looked among all the old papers, but was unable to find the deed, and she was sure that it was lost. Witness' mother, Mrs. Martha J. Cramer, was the grantor in the deed. The date of the deed from witness' mother to her husband to the SE¼ of SE¼ of section 21, township 15 south, range 16 west, was a few days before witness and her husband conveyed to C. E. Cramer a square containing four acres in the northeast corner of the tract. Witness' husband could not write a deed to C. E. (Council) Cramer until witness' mother made witness' husband a deed. Witness lived on the land twenty-one years until she moved to Camden the year before giving her testimony. None of the appellants have made any claim to the land within the last ten or twelve years before this action was brought.

On cross-examination witness testified that her husband bought from her mother two forties that lay north and northwest of the tract in controversy. Witness could not remember the numbers. The deed to those two forties and the deed to the tract in controversy were the only two deeds to witness' husband that witness remembered her mother signed. Witness thought the deed from witness' mother to witness's husband to the land in controversy was executed in January, 1905, but she didn't remember the day of the month and didn't remember the character of the deed, but she was sure that she had seen it. Witness knew that she would not have signed the deed to Council without seeing the other deed. She also knew that she would not have signed the deed to Council Cramer from other circumstances. Witness was asked: "Can you tell me what land was described in that deed?" (referring to the land in controversy), and answered: "The SE¼ of the SE¼ of section 21, township 15 south, range 16 west." She was asked whether the land was south or north of the fifth principal meridian, and did not answer. She was asked, "How did the description read in the deed, Mrs. Hughes?" and answered, "Well, I don't know." Question: "Did it read section 21, township 15 north, range 16 west?" and answered, "Yes." Witness didn't know whether it was a warranty deed or a quitclaim deed, and knew that it was a conveyance of a fee simple estate. She didn't know what language was used in making the conveyance. She was not in the least interested in deeds in those days, and didn't remember or pay any attention. Her husband did all that. Witness read the deed from her mother to her husband before she and her husband signed Council's deed. Witness didn't remember that she read it then, and didn't remember that she heard her husband speak of it then, but did hear him speak of it afterwards. Witness finally stated that she heard her husband speak of the deed at the time he made the deed to Council Cramer. Witness knew that Mr. Cook took the acknowledgment of the deed in con-

troversy because he acknowledged all their papers. She supposed that is the only reason she knew it. Witness was sure she put the deed in the box in the trunk because that was where she kept all the deeds. · Witness thought her husband got the deed out of the box to have the abstract made in 1916 or 1917—in December, 1916, the best witness could remember. The deeds at that time had not been recorded. T. I. Thornton made the abstract. Her husband had the abstract in his possession something like a year before he died. Witness and her husband looked over the abstract, and they talked about it. They didn't know that the land in controversy was not included in the abstract, and didn't know, when her husband died, that the deed was lost. Witness didn't know that the abstract did not show the deed in controversy until she was told by her attorney. Witness further stated that she couldn't say whether the deed was a lifetime deed or any other kind of a deed, and also stated that, if the deed was lost, it was the only deed conveying land to her husband that had been lost. Other deeds conveying lands to her husband were found after her husband's death up in Rumph & Tyson's safe, merchants with whom her husband did business. Before leaving these deeds with Rumph & Tyson for safekeeping, they were placed on record. Witness didn't know the date they were recorded. Witness' mother died in January, 1913, and her husband died in 1918. Witness was fifty-three years old at the time she testified. During her husband's life witness never paid any attention to land numbers or anything of the sort, and such knowledge as she had she had obtained since his death, and since the discovery of oil in the locality of these lands. Before her husband's death witness only knew that part of the land was in section 21 and part in section 28. She didn't know what land her husband owned. In regard to the search for the alleged lost deed, Rumph & Tyson told witness that all of her papers were in one envelope, and they gave that envelope to witness. Rumph knew that the deed was lost, but wit-

ness, after discovering that same was lost, did not go back and ask for a further search for it to see if it could be found in their safe.

In addition to the above, and bearing on the issue as to whether or not the appellants are barred by laches from maintaining this action, Mrs. Hughes testified that during the time she lived on the tract adjoining the land in controversy none of the Short family or the Langston family ever came there and made claim to the lands. In 1882 and 1883, or 1883 and 1884, Mrs. Langston lived on one of the north forties two years, and after leaving there she came back and visited witness' mother at witness' house in 1908, at which time she asked witness' husband, in the presence of witness, who owned the land in controversy, and witness' husband told her that he owned it. That he bought it from witness' mother, but that, if any of the other heirs wanted the land, if they would pay him the expenses he had been put to, they could have it. Mrs. Langston replied that she didn't want it, and wouldn't pay the taxes on it for it.

C. E. Cramer testified that in 1905 he bought from J. W. Hughes and wife four acres of land in the SE¼ of the SE¼ of section 21-15-16. He had taken possession of it a short time before the deed was made under agreement with J. W. Hughes. He built a house on it and cleared up the land and inclosed it with a fence after he obtained his deed. He is still in possession of the land. Witness had known the land ever since he could remember, and he was then forty-three years old. It was known as Mrs. Mattie Cramer's place for a good many years before Hughes succeeded her in the possession of it. Mrs. Mattie Cramer was Mrs. Hughes' mother. That was the way it had always been understood by the witness and the people there. Some five or six years prior to the time witness bought the four acres, J. W. Hughes claimed to own the forty, and had a part of it inclosed, possibly two or three acres where the old house place was. He cultivated it one year. The fence burned away, and

he did not fence it any more. This was about the year 1900. Hughes claimed to be in possession of the forty, and used it as his own. He sold timber from it to the mill companies and to people who worked it. Usually Hughes made ties himself and sold the ties. The entire forty acres was never inclosed at any time, and none of it was cultivated except the small place that Hughes inclosed where the old Johnson home was situated. Hughes never moved and lived on the forty. The fence around the inclosed tract had been placed there by Mrs. Mattie Cramer or her sons, and these had made crops there before Hughes' purchase. George Cramer cultivated the small tract of land ten or twelve years before witness bought the four acres from Hughes.

Robert Harding testified that he had lived within three-quarters of a mile of the land in controversy for twenty or twenty-five years. He was asked who had been in possession of it, if anybody, and if so, how long, and who had claimed to own it during that time. He answered that the Cramer estate and J. W. Hughes had been in possession of it ever since he had known the place. Mrs. Mattie Cramer was in possession of it until Hughes took possession. Witness knew nothing about the title to the land. This was prior to the time C. E. Cramer purchased the four acres from Hughes. So far as witness knew, no part of the forty acres was ever inclosed except the C. E. Cramer four acres in the northeast corner. J. W. Hughes married Mrs. Mattie Cramer's daughter. Witness didn't know by what title they claimed, but they claimed it. The forty on which Council Cramer obtained the four acres was all claimed by the Cramer estate, and they had it in their possession. Witness understood that J. W. Hughes owned it and had possession of it.

George Cramer testified that he was the son of James H. Cramer and the brother of Mrs. Janet Hughes. The heirs, all except Mrs. Hughes, deeded their interests to J. W. Hughes and Mrs. Hughes. The witness was a party to the suit, and was claiming an interest in the land in controversy if the court so decided.

A. M. Sutton testified that he bought leases, including the lands in controversy, in the fall of 1922, from Mrs. Hughes and her children. The land at that time was wildcat territory. At the time of its purchase there were five producing wells within five miles of it. He paid $5,000 for the leases, and agreed to drill a well on the property within thirty days from the completion of the title. At the time witness purchased the property such acreage usually sold from a dollar an acre on up. A dollar an acre is considered a fair price. Witness liked this acreage, however, and paid the sum of $12.50 an acre. After the first producing well came in, the market value of the land per acre was from a thousand to three thousand dollars. Witness refused $1,500 an acre for the land in controversy. The land with the developments now on the property would be worth $110,000.

W. D. Langston testified, among other things, that in 1886 he turned over to Mrs. Martha Cramer the rent for the purpose of paying the taxes on the property. He stated that three mules were sold, and the proceeds turned over to J. H. Hughes to keep up the taxes on the property; that in 1902 witness sent $50 to Mrs. Cramer to pay taxes. Witness didn't know until 1923 that Mrs. Cramer was selling the land that belonged to the Johnson estate, when he wrote the sheriff about the taxes in January, 1923, and this suit was instituted in March, 1923. The sheriff wrote the witness to come over and attend to it, and he found that most of the land had been sold. Witness' mother, one of the heirs to the Johnson estate, told witness that three mules had been sold to keep up the taxes on the place. Witness' mother came back to visit Mrs. Cramer in 1910, and always claimed to own an interest in the land, and, since her death, witness claimed her interest in the land by descent.

C. F. Mullins testified that he sold land of the same character of the land in controversy for $1 an acre.

D. W. Short testified that his mother died in 1882, in Texas. She was one of the heirs to the Johnson estate.

Witness' father had let Jim Cramer have a pair of mules, and it was understood that he was to pay the taxes on the land until the same was exhausted, and then to notify the witness and his mother. Witness always felt that he had forty acres of the land.

It was shown that the taxes on the lands in controversy were paid for 1887 and 1888 by D. W. Short; in 1889 by J. W. Brown; from 1890 to 1895, inclusive, by Martha Cramer; from 1900 to 1902 by H. L. and Leo Barg; from 1903 to 1919 by J. W. Hughes, except on four acres thereof which was paid by C. E. Cramer. The taxes were assessed in Hughes' name in 1921, and were paid by J. E. Hughes. J. W. Hughes paid the taxes in 1922, and they were assessed in his name in 1923, and marked unpaid.

In addition to the above, the pleadings and testimony disclosed the following facts: When the cause of action was begun, it involved title to 280 acres of land in Ouachita County, including the lands in controversy. All parties claimed title from a common source, to-wit: William G. Johnson, except the SE¼ of section 21, in which the lands now in controversy are situated. As to the SE¼ of section 21, the appellants claimed title from Sherman Wakefield, the patentee of the government, who conveyed to William G. Johnson. The appellees deraigned title by mesne conveyances from Wakefield, the patentee of the government, to Mrs. Lavinia Johnson, and from Mrs. Lavinia Johnson to Martha J. Cramer and J. W. Hughes. The appellees set up that the mesne conveyances from Wakefield had been lost. William G. Johnson died in 1862. Lavinia Johnson was his mother, who died in 1873. William G. Johnson died unmarried and without issue, and whatever interest he had in the land in controversy passed, under the laws of descent and distribution, to his sisters, Mary Langston, Caroline Short and Martha Cramer. Mrs. Caroline Short died in 1882. Mrs. Mattie Cramer died about the year 1913. Caroline Short and Mary Langston were residents of Ouachita County, and

were cognizant of the death of William G. Johnson and
Lavinia Johnson. After the death of William G. John-
son in 1862, Caroline Short and her husband moved to
Texas, taking with them Mrs. Lavinia Johnson, who died
at their home in 1877. After Caroline Short died, in 1881
or 1882, her son, George Short, returned to Arkansas
with his aunt, Mary C. Langston, and moved on the
north half of the southeast quarter of section 21. George
Short died in 1883 or 1884. After his death Mary C.
Langston and W. D. Langston moved to Louisiana and
afterwards to Texas, where Mrs. Langston died in 1914.
The taxes were paid by the husband of Caroline Short
until the year 1888. From then on they were paid by Mrs.
Martha Cramer to 1903, and since that time, as we have
stated, by J. W. Hughes and those claiming under him.
Mrs. Martha J. Cramer resided upon lands near the tract
in controversy until her death in 1913.

After hearing the testimony the court found that it
was insufficient to establish the existence and execution
of a deed from Mrs. Mattie Cramer to J. W. Hughes con-
veying the lands in controversy. But the court found in
favor of Mrs. Hughes and others, appellees, as against
appellants, the other parties to the action, and dismissed
their alleged cause of action for want of equity, from
which decree is this appeal.

1. The chancery court found that the testimony of
Mrs. Janet Hughes was not sufficient to establish the lost
deed under which the appellee claims title to the land in
controversy. We cannot say that this finding is clearly
against a preponderance of the evidence. It is true, Mrs.
Hughes testified quite positively that her mother did
convey to her husband, J. W. Hughes, the particular land
in controversy, but, when her testimony is taken as a
whole, as it must be, it does not fulfill the requirements
of the law as to the proof necessary to establish the execu-
tion, contents, and loss of a deed to land.

In *Erwin* v. *Kerrin*, 169 Ark. 183, we said: "The rule
is well established in this State, as well as by the authori-

ties generally, that the burden is upon one who claims title under the alleged lost instrument to establish the execution, contents, and loss of such instrument by the clearest, most conclusive, and satisfactory proof." See cases there cited, and also *Queen* v. *Queen,* 116 Ark. 370; *Wilson* v. *Walker,* 158 Ark. 4.

Learned counsel for the appellees, to sustain their contention that the finding of the chancellor on this issue was contrary to the preponderance of the evidence and erroneous, cite cases in which we stated that, in determining the issue as to whether or not a deed had been made or lost, it was proper for the jury to take into consideration oral evidence that such deed was made, and, in connection with such oral evidence, who claimed to be the owner of the land, how long such claim had been set up, whether the land was held adversely to such claim, if wild and uncultivated, who paid the taxes on said land, and whether or not said land had been recognized and known as the land of the party who claimed title to it by virtue of the lost deed, and all the surrounding circumstances. The attorneys argue that, if such evidence should be sufficient to support the verdict of a jury establishing the execution of a lost deed, then such testimony should likewise be sufficient to convince the mind of a chancellor. See *Steward* v. *Scott,* 57 Ark. 153; *Carpenter* v. *Jones,* 76 Ark. 163. And, if this court would not set aside the verdict of a jury that a deed had been lost bottomed upon such evidence, then we should reverse a contrary finding of the chancellor based upon such evidence. *Non sequitur.*

The argument is unsound for the reason that the jury are the sole judges of the evidence and the credibility of witnesses, and in determining issues of fact the verdict of the jury will be sustained by this court where there is legally sufficient evidence to sustain it. But a chancery court, on issues of fact, might reach an entirely different conclusion from what a jury would reach on the same evidence. On appeal from its finding this court tries the

issues *de novo*, and only when in doubt as to the finding that should be made do we treat the findings of the chancellor as persuasive, and adopt the same as our own; and we reverse the findings of the chancellor only when we are convinced that they are clearly against a preponderance of the evidence. *Smith* v. *Leach*, 130 Ark. 165, and cases there cited. As already stated, an entirely different rule prevails here as to the verdict of a jury, which is treated as conclusive on issues of fact, where there is any legally sufficient evidence to sustain it. The testimony of Mrs. Janet Hughes, and the testimony *aliunde*, which counsel for the appellees contend is in corroboration of her testimony on the issue of the lost deed, when all of it is considered together, does not measure up to the standard of proof exacted by the law for the establishment of the existence, contents, and loss of instruments that are muniments of title to land. It could serve no useful purpose to discuss the testimony of Mrs. Hughes and the other testimony upon which counsel for appellees rely to sustain their contention on this issue. Mrs. Hughes' testimony is set out above, and it certainly cannot be characterized as clear, decisive and satisfactory. On the contrary, it is obscure, vague and indefinite. The chancery court was therefore correct in holding that the lost deed, under which the appellees claim, was not established.

2. But we are convinced that the chancellor was likewise correct in holding that the appellants are estopped by their laches from maintaining this action. Counsel for appellants contend that they are only asserting a purely legal title to the lands in controversy, and that, as against such title, the plea of laches cannot avail the appellees. But, in making this contention, learned counsel for the appellants seem to have overlooked their own pleadings. While it is true that in his original complaint the appellant Langston alleged that he was the owner of a one-third interest in the lands as the only heir of Mary C. Langston, and that the Short heirs were the

owners of a one-third interest as the heirs of Caroline Short, and that the heirs of Martha J. Cramer were the owners of the other third interest, nevertheless they voluntarily entered the forum of chancery and asked affirmative relief, which only a court of equity could grant. Among other things he alleged in substance that the appellees were estopped from claiming any part of the lands in controversy, for the reason that their ancestor, Martha J. Cramer, had appropriated from the estate of William G. Johnson more than her share of that estate. And the heirs of Caroline Short, also appellants, adopted the contention of Langston in their cross-appeal, and prayed that the appellees be estopped from claiming any interest in the land in controversy, and that their title to an undivided one-half interest in said tract be quieted. Moreover, the appellants sought by their pleadings to have canceled certain oil and gas leases and mineral deeds executed by the appellees. Coming into a court of equity and seeking affirmative equitable relief against the appellees, the appellants are in no attitude to contend that the appellees are precluded from pleading and proving that the appellants are barred by their laches from maintaining the action and obtaining the relief prayed by them. While laches cannot operate to invest a title in the appellees, nevertheless the laches of the appellants, if proved, is a perfect defense to their action and estops them from maintaining the same.

Likewise we deem it unnecessary to reiterate and argue at length the facts which we conclude constitute laches on the part of the appellants. The facts speak for themselves. Counsel for appellants argue, in the first place, that there was no delay, and, in the second place, that, even if appellants delayed to assert their rights, such delay worked no disadvantage to the appellees. We cannot adopt this view of the evidence. Without restating the facts, they show that the appellants had knowledge that Martha J. Cramer and those claiming under her were asserting rights to the land in controversy wholly

inconsistent with any rights of the appellants as tenants in common with Martha J. Cramer. The findings of the trial court are general, but it might well have found, and doubtless did find, that for a period of at least thirty-five years, from 1888 to 1923, the taxes on the lands were paid by Mrs. Cramer and J. W. Hughes, under whom the appellees claim title. Certainly the testimony of C. E. Cramer, Hardin and Mrs. Hughes as to the possession and claim of ownership of the lands by Mrs. Cramer and J. W. Hughes was sufficient to justify the court in finding that, even before 1905, Mrs. Mattie Cramer was claiming to own the lands as her very own, and not as a tenant in common with appellants, and as early as 1905 J. W. Hughes was claiming to own the land. The testimony of C. E. Cramer is very clear to the effect that, before he acquired the land from Hughes in 1905 and as early as 1900, Hughes had fenced and cultivated a portion of the land. He had sold timber, and had made and sold ties from timber on the land, and in 1905 continued to exercise at least a claim of ownership by conveying four acres of it to Cramer. The conduct of Mrs. Cramer and Hughes with reference to the land, according to these witnesses, was such as to impress everybody in that vicinity that first Mrs. Cramer, and then Hughes, owned the land from 1900 on. If the appellants were not so impressed, it was because they shut their eyes to the situation, and had abandoned all interest that they claimed to have in the same. When the facts are analyzed, it will be seen that the chancellor was justified in finding that there was more in them than simply the lapse of time, the payment of taxes by the appellees, and the enhancement of value, to estop the appellants from maintaining their action.

Without further arguing the facts, it suffices to say our conclusion is that the case comes well with the doctrine of laches as announced by us in many cases. *Turner* v. *Burk,* 81 Ark. 352; and *Underwood* v. *Dugan,* 139 U. S. 380, therein cited, and the recent case of *Avera* v. *Banks,* 168 Ark. 718. Even if it could be said, as con-

tended by the appellants, that Mrs. Martha J. Cramer secured possession of the land by permission of the appellants, and that during the period of her occupancy she was a tenant in common with the appellants, and occupied a relation of trust and confidence to them, which would make the taxes paid by her inure to appellants' benefit, nevertheless the undisputed testimony shows that Hughes was claiming the land in 1905, and Mrs. Langston knew this as early as 1908, for Hughes told her that he owned it, and that he bought it from Mrs. Cramer, and informed Mrs. Langston that if they would reimburse him for his taxes and expenses they could have the land, and she replied that she didn't want it and wouldn't pay the taxes on it for it. From that time on until the institution of this action in 1923, a period of fifteen years, the appellants had knowledge that J. H. Hughes was claiming to own the land, and that the taxes thereon were being paid by him, yet they made no gesture towards challenging his claim of ownership or towards assuming the burden of taxes until the lands had tremendously enhanced in value by the discovery of oil thereon, and until oil and gas leases and assignments thereof to various parties had taken place. After the appellants have allowed these conditions to obtain, it is a great mistake to assume that the delay of appellants (if they obtain the relief they seek) has not worked to the disadvantage of the appellees.

The cases of *Casey* v. *Trout,* 114 Ark. 359, and *Jones* v. *Temple,* 126 Ark. 86, upon which counsel rely to sustain this contention, have no application because of the difference in the facts of those cases from the case at bar. The facts of this case bring it within the doctrine of laches announced by us in *Osceola Land Co.* v. *Henderson,* 81 Ark. 432, 439, where, speaking through Mr. Justice RIDDICK, we said: "Laches in legal significance is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly within limits allowed by law; but when, know-

ing his rights, he takes no steps to enforce them until the condition of the other party has in good faith become so changed that he can not be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as estoppel against the assertion of the right. This disadvantage may come from loss of evidence, change of title, intervention of equities and other causes; for, where the court sees negligence on one side and injury therefrom on the other, it is a ground for denial and relief."

It follows that the decree of the trial court dismissing the appellants' complaint for want of equity is correct, and the same is therefore affirmed.