PREAS *v.* PREAS.

4-3349

Opinion delivered February 12, 1934.

*Martin, Wootton & Martin,* for appellant.

*Murphy & Wood,* for appellee.

BUTLER, J. Dr. Hugh L. Preas, the appellee, brought this suit against his wife, Louise Lamb Preas, the appellant, on the 25th day of January, 1933, in the Garland Chancery Court. The complaint alleged grounds for divorce, to which the proof was directed, that his wife, immediately after marriage, "began a course of cruel and barbarous treatment towards him and continued such treatment, and offered such indignities to his person, as to render his condition intolerable, and that he, as a result thereof, was no longer able to live with her; * * * that she treated him with unmerited reproach, rudeness, contempt and open insult, habitually and systematically pursued, and that such conduct on her part rendered his condition in life intolerable, all without fault on his part." He prayed for a decree of absolute divorce, which prayer was granted by the chancellor upon a hearing of the case. From that decree is this appeal.

The contention of the appellant is that the proof fails to establish the grounds of divorce alleged. The appellee argues to the contrary, and further states as ground for affirmance that, from the decree, it appears that the testimony of a witness taken orally in open court was not preserved and incorporated in the transcript of the testimony, and that therefore the conclusive presumption follows that the evidence contained in the testimony of that witness must be deemed sufficient to sustain the findings and decree of the trial court.

There is presented for our consideration a record containing 760 pages of typewritten matter, most of which preserves the testimony of the witnesses, with the exhibits offered as part of the evidence. From the evidence, certain facts are proved about which there is no

dispute, and which are important in determining the main question presented in the case.

Dr. Preas and his wife, Louise, were both reared in Johnson City, Tennessee, a small city, we are informed, of not more than 5,000 inhabitants, one of those towns where everybody knows everybody else, and all their virtues or their vices. Both parties to this litigation were members of prominent families who had resided in Johnson City for many years. They were of equal social rank and universally regarded with esteem. Preas began to pay attention to Louise Lamb when she was a mere girl of not more than fifteen or sixteen years of age. He was perhaps ten years older than she. Prior to their marriage he had been a frequent visitor at her home and had paid her marked attention for at least a year and a half or two years. During this time she paid no attention to any other man and gave to Preas her full confidence and love, and he seemed to be devoted to her. He had the entree into her home at all times and enjoyed the perfect confidence of her father and mother.

Dr. Lamb, the father of Louise, was a retired physician, and about the time of the marriage was past fifty-five years old, and an invalid. Louise was a member of, one of the churches of the city, in which she took a prominent part and was regarded with favor by the inhabitants of the little city. Preas appears to have also been regarded generally as a man of honor. He and Louise were married in the State of Tennessee on September 15, 1932, at which time Dr. Preas must have been about 28 years old and Louise about eighteen, if that old. After the marriage she stayed in the home of her parents for a few days, when Preas took her and established her in a hotel in a town nearby. He is a dentist, and continued to practice his profession in Johnson City. She remained in this hotel but a very short time, when Preas secured board for himself and wife in Johnson City, at the boarding house of a Mrs. Crockett. They remained there until about the 22d day of November, when Preas informed his friends that he was going to New York to enter the sanitarium of his brother, a physician residing in that city. He gave the sanitarium as his forwarding address,

and his mail was sent there. Instead of going to New York, however, he went directly to Hot Springs, Arkansas, and his mail was forwarded to him at Hot Springs from New York. It was his admitted purpose to establish a residence in Arkansas in order to take advantage of its ninety-day divorce law, and to bring this suit.

The greater part of the testimony was directed to the association of Preas and Mrs. Preas previous to their marriage, and to the events leading up to and bringing about the marriage on September 15th. This testimony we do not detail for the reason that it is immaterial and incompetent, except as it tends to explain the subsequent conduct of the parties. The testimony of Preas is to the effect that he was forced into marrying Louise Lamb by her father, who put him in fear of suffering bodily violence, and that he was falsely accused of improper conduct with Louise. These contentions of Preas are contradicted by the evidence adduced by his wife, the effect of which is that, when reproached for his conduct, Preas acknowledged his illicit relations with her, pleaded their approaching marriage, and that he was not threatened with any personal violence, but knew that he had violated the criminal statutes of the State of Tennessee and of the general government, and that he was liable to prosecution. About three or four days after this the marriage took place in the presence of the father of Preas and of Mrs. Lamb, the father of Louise not being present.

The evidence is undisputed that, while Preas and his wife were living in the boarding house, they both seemed unhappy. The girl was sick much of the time and was frequently seen in tears. Preas often took his meals away from the boarding house, and on occasion would leave his young wife alone and spend his week-ends away without her knowing where he was. From the date of his marriage until his clandestine departure from the State of Tennessee, he neglected his wife, gave her no presents or furnished her any money during the entire time. The extent to which his care extended was only to provide her a shelter and food. These facts, coupled with what happened just before the marriage, which we have related, viewed either as contended for by Preas or as testified

to by his wife and her parents, to our minds result in but one just inference, that is, when Preas married he never intended to conform to, and abide by, his marriage vows, whether they were taken because he was wrongfully accused of misconduct and threatened with personal violence or whether because he feared the penalties of the laws which he had violated.

Preas' sole ground for divorce is based on the allegations which we have quoted. We summarize and state his testimony tending most strongly to support these. It is to the effect that he told Louise that he did not have enough money, and did not see how they could get by on what he had and was making; that a few days after they moved to Mrs. Crockett's boarding house he saw his wife on the street one day with her mother; that he asked her later why she was with her mother, and she denied that she had been with her mother or that he had seen her; that several days later the mother came to the house and stayed with his wife most of the day; that the next day she came over again, and did so for three days while his wife stayed in bed complaining that she was sick and of having pains in her stomach, being nauseated and not able to be up; that at night, after they had retired, she would pinch and hit him so as to keep him awake, and that this caused him to get nervous and run down; that one night he told her that he was going to his father's home to get some sleep, and he did go, and was informed that on that night his wife began to call about 11:00 o'clock over the telephone, and called about every fifteen or twenty minutes, saying she was sick and couldn't sleep and wanted some one to see her or for a doctor to come; that his brother, Dr. William Preas, went over and gave her some medicine; that she would frequently come to his office and argue with him as to where he had been and would come back again within an hour or so "and start fussing again"; that she came in about three or four times in one day, and that night she kept him awake by hitting, biting and smacking him; that when he would get to sleep she would hit and pinch him, or do something else, and that she did this all the time they were at Mrs. Crockett's.

Witness said, "I got to where I was almost afraid of her. At times she would threaten to kill herself, and she had left me with the impression that when she did kill herself she would probably kill me, and I was afraid she would kill both of us. I had no peace of mind or body during the entire time I lived with her."

In corroboration of this testimony, Preas offered the depositions of Mr. and Mrs. Crockett and of a Miss Willie May White, his bookkeeper and office assistant, and Dr. Wm. Preas. Mrs. Crockett stated that Dr. Preas had paid board for himself and wife; that he did not take his meals regularly at her place; that "Dotty" (the name Preas was known by) was nervous and pale, and that he and his wife were indifferent toward each other, but they went out together some; that Dr. Preas spent some weekends at her house with his wife and some he spent away; that she didn't really know whether most of his weekends were spent with his wife or away from her; that, while Dr. and Mrs. Preas boarded at her house, Mrs. Preas was nervous and hysterical at times and cried a great deal; that witness called Dr. Preas several times for his wife when she was sick, and that her mother came over to see her when she was sick. On cross-examination, in speaking of seeing Mrs. Preas crying often, witness said: "We all cry sometimes, especially if our wives or husbands would leave us."

Mr. Crockett made about the same statement, but ventured the opinion that Dotty seemed to be a nice fellow, but that something was on his mind, and that he never saw the two kiss each other.

Miss White, Dr. Preas' office assistant, testified that, after his marriage, he seemed nervous, worried, pale and not able to attend to his patients at times; that he was not this way before his marriage; that the doctor's wife came to the office frequently and also called frequently over the telephone.

Dr. William Preas, testifying as to matters coming under his observation after the marriage, stated that his brother looked worried; that Louise would call for him at the Preas home four or five times, and one night he

was called four or five times to come to see her; that she was having nervous convulsions, and, when he reached her, he found her nervous and hysterical. "On some of these occasions, my brother would be there, and at other times not." In speaking of his brother's physical condition, he stated that it was bad, that he was nervous, restless, had lost weight and that he would come sometimes to their home in the afternoon and sleep.

Other witnesses for the appellee testified as to his general reputation, and that it was good.

It will be observed that the appellee's testimony is corroborated only as to the telephone calls and visits to his office, and that the personal indignities which he says he endured at the hands of his wife find no corroboration in the testimony of any witness. In order to justify a decree for divorce, it is a familiar rule that a decree will not be given on the uncorroborated testimony of a complainant.

It is the contention of the appellee that we must conclusively presume that his testimony is sufficiently corroborated to sustain the decree because it shows that a witness, one D. W. Parker, gave oral testimony in open court, and, in support of this contention, cites our rule stated in *Hardie* v. *Bissell*, 80 Ark. 74, 94 S. W. 611; *St. L., I. M. & S. R. Co.* v. *Bright*, 109 Ark. 4, 159 S. W. 33; *Harmon* v. *Harmon*, 152 Ark. 131, 237 S. W. 1096; *Langston* v. *Hughes*, 170 Ark. 272, 280 S. W. 374, and in numerous cases, that, where some of the testimony before the chancellor has not been brought into the record, this court must presume that such testimony was sufficient to sustain the decree.

We adhere to this rule, which was early announced and has been consistently followed, but it has no application to the facts in the case at bar. It might have been, and, as we shrewdly suspect, that the evidence of Parker related only to the residence of the appellee in Hot Springs, but, if it went to the merit of the case, given its greatest value and strongest probative force in favor of the appellee, it could only go to corroborate his testimony as to the alleged indignities he suffered. By no stretch of the imagination could this witness be presumed to

know more about what occurred in the privacy of the room of these married persons than the husband himself. Therefore, taking the testimony of Preas as literally true and fully corroborated by the testimony of Parker, it still does not sustain the allegations of his complaint, or make out a case for divorce under the 5th clause of § 3500 of Crawford & Moses' Digest, which reads as follows: "Where either party shall be addicted to habitual drunkenness for the space of one year, or shall be guilty of such cruel and barbarous treatment as to endanger the life of the other, or shall offer such indignities to the person of the other as shall render his or her condition intolerable."

In the early case of *Rose* v. *Rose*, 9 Ark. 507, the rule was laid down that, before this statute could apply, the conduct of the offending spouse must have been of such nature as to connote settled hate and a plain manifestation of alienation and estrangement, and must have been conducted habitually and continued through a period of time sufficient to show that conduct arose through settled malevolence and exerted to an extent as to render it impossible to discharge the duties of married life, resulting in such anguish of spirit as to make one's condition in life intolerable. The statute was an extension of the law as it then existed, and the court reluctantly recognized that extension.

In the case of *Kurtz* v. *Kurtz*, 38 Ark. 119, the court, adverting to the case of *Rose* v. *Rose, supra,* and discussing its interpretation of the statute, said: "It must be confessed that this position goes to the very verge of safety, and should be pressed no further. In applying it, the chancellors should act with great caution to avoid the gradual approach, by imperceptible steps, to the practice of holding all matrimonial bickerings by which parties may render each other unhappy, to be valid grounds of divorce. Where there are no fixed and well-defined barriers of principle, it is difficult to limit the encroachment of precedents, setting in one direction. Each so nearly supports the next that, before one is aware, the bounds of reason are passed."

In numerous cases following we have adhered to the limitations of the rule as suggested in *Kurtz* v. *Kurtz, supra*. In *Meffert* v. *Meffert,* 118 Ark. 582, 177 S. W. 1, the following language is used: "So it may be said that the remedy of absolute divorce contemplated by this clause of our statute is for evils which are unavoidable and unendurable, and which cannot be relieved by any exertions of the party seeking the aid of the courts."

In *Pryor* v. *Pryor,* 151 Ark. 150, 235 S. W. 419, one of the grounds for divorce was the same as in the instant case, and the court, in passing on the sufficiency of the evidence to support it, concluded that, if the testimony of the complainant as to this ground was undisputed, it does not establish that there was any settled hate or any condition of enduring alienation and estrangement. We have many cases which follow and approve the rule announced. Among these are *Arnold* v. *Arnold,* 115 Ark. 302, 170 S. W. 486; *Poe* v. *Poe,* 149 Ark. 62, 231 S. W. 198; *Scales* v. *Scales,* 167 Ark. 298, 268 S. W. 9. The reason for the rule that the indignities must be so grave and so long continued as to go beyond the reach of mutual forbearance or forgiveness is that, not only the parties themselves, but society, has an interest in the maintenance of the marriage tie and the evils to be anticipated from granting divorces, except for the gravest reasons, should compel the persons to conciliate each other and suffer long before an attempt to sever the bonds of matrimony. In *Pryor* v. *Pryor, supra,* it is said: "Marriage vows are solemnly assumed, and should be sacredly kept. The interests of society demand that the bonds of wedlock should not be severed except upon clear proof of one or more of the grounds prescribed by our statute."

In the case at bar, there is nothing in the testimony of Preas tending to show that the acts of his wife complained of arose from any fixed malevolence or settled hate, but the proper inference is that her conduct was occasioned by a physical and mental condition caused largely by his own acts. From the very nature of things, there could not have been a course of conduct continued for a period of time sufficient to warrant an invocation of the statute. It will be noted that only 67 days elapsed

from the date of the marriage until the appellee's clandestine departure from his home and State for the purpose of bringing this suit. During that time it is not disputed that he spent a part of his week-ends away from his wife and practically all of his time during the day. Certainly, the interests of society demand that during a space of time so brief some duty would rest upon the husband to comfort an ailing wife, at least not to assume the right, because of her petulance through so short a period, to renounce the most sacred of all contracts.

Appellee's own testimony fails to bring his case within the rule we have cited, and, if it did, the evidence is clear that the appellee himself is not without fault. His neglect was sufficient, even in the mind of his landlady, to justify the tears of his young wife, and she had reason to expect some consideration. But she appears to have been ostracized by her husband's family with the sole exception of his brother, Dr. William Preas. It is undisputed that during this time she was sick, and every principle of honor and fair-dealing should have impelled the appellee to make some effort to soothe and comfort her. Where parties are equally at fault, the right of divorce should be denied. *Strickland* v. *Strickland,* 80 Ark. 451, 97 S. W. 659; *Healy* v. *Healy,* 77 Ark. 94, 90 S. W. 845; *Malone* v. *Malone,* 76 Ark. 28, 88 S. W. 840; *Arnold* v. *Arnold, supra.*

In determining, in any given case, whether the facts relied upon bring it within the statute, regard must be had to the peculiar circumstances of the case and the mental and physical condition of the party against whom complaint is made. This is recognized in the case of *Meffert* v. *Meffert, supra,* and, as we have seen, the condition of the wife, both as to her mental and physical state, was such as not to call for the coolness and neglect manifested by the appellee toward her, but rather for tenderness and forbearance.

We might add that the courts of Tennessee were open to this young man for redress of any grievance, and his surreptitious conduct and secret removal to this State to invoke the aid of our courts implies that he desired to gain an advantage over his wife, and manifests to us that

he had little real confidence in the righteousness of his cause.

The decree of the trial court is reversed, and the case dismissed.