## SHELTON *v.* SHELTON.

### Opinion delivered January 22, 1912.

DIVORCE—UNCORROBORATED TESTIMONY OF PARTIES.—A divorce will not be granted upon the uncorroborated testimony of the parties.

Appeal from Chicot Chancery Court; *Zachariah T. Wood,* Chancellor; reversed.

#### STATEMENT BY THE COURT.

This was a suit for divorce, instituted by the appellant against the appellee, in which the appellant, among other things, alleged in her complaint that defendant "charged her, while they were living together as husband and wife, with having taken provisions and groceries out of the commissary of the defendant and giving them to her married son. That the defendant repeatedly told plaintiff that he wished she would leave his home and never return; that she did not want to leave

the defendant and tried every way possible to stay with him and put up with all the indignities offered her." She further alleged that the defendant "had John Haley, Count Stephenson and Ed. Everett to call to see her and advise her to leave the house of the defendant." "That under this pressure and with many indignities and insults offered to plaintiff that she could not stay with the defendant any longer. That the defendant charged her with stealing provisions out of the commissary, and time and again insisted upon her leaving." She makes, in addition, the general charge "that the defendant offered her such indignities as to make her life intolerable."

Appellee answered, denying the allegations of the appellant's complaint, and alleging that "the plaintiff and himself did not get along at all times in perfect peace and domestic tranquility; that the plaintiff, on two different occasions after their marriage, about two years ago, left the defendant and was gone for two or three days, she being in a tantrum on account of this defendant sending his children to school, but that she repented in a few days and returned. That some two years ago she again became infuriated, and in a fit of passion left defendant and was gone some six weeks. That her children have offered the defendant many indignities, and had at all times treated him badly and insulted him frequently in the presence of their mother, and that she has encouraged the conduct of her children, and offered the defendant such insults and indignities, and has done so continuously, as to make life intolerable for him." These allegations are preceded by the allegation that the appellant at the time of appellee's marriage with her was a widow, having several children, and that he also was a widower, having several children.

There were allegations in the complaint as to the settlement of the property rights between the appellant and the appellee, which, in the view we have taken of the testimony in the case, it is unnecessary to set out. The plaintiff prayed for complete divorce, and for maintenance, alimony, costs and attorney's fees. The appellee made his answer a cross complaint, and asked that he be divorced.

Appellant testified that she and the appellee lived together as husband and wife for five years; that appellee was treating her in such a way that she could not stay with him. She says:

"He was anything but good to me in some ways. He used language to me that was not becoming to any man. I would ask him and beg him, and he knows it, to let us live together, that I would rather live with him than to quit, and he says that when he is done with anybody he is done with them, and he would not listen to me in any way. He went so far as to slap me. He cursed my little boy, who was about four years old. Then I told him that was mighty hard for me to take; I couldn't stand that; and he slapped me on the side of my face, and it was paralyzed for some time before I had any feeling in it. I didn't quit him then. I went ahead, and tried to live through. He said that I would take things from the commissary and give it away when I didn't do it. He just as good as asked me to leave him. He said: 'There is no use for us to try to live together in peace.' I said that it was not my wish to quit. 'I know for my part that we can live together in peace,' but I told him if nothing would do only for me to quit I reckon I will have to quit. Mr. Shelton went on the outside of the road, and talked awhile to Mr. Everett, Mr. Haley and Mr. Stephenson. Then they came to the house, and told me that they had been talking to Mr. Shelton, and it would be best for me to quit Mr. Shelton. They said it would be more credit for me to quit Mr. Shelton than it would be for me to stay there under the circumstances. There was a man living in the house I am living in now, and I didn't think I would leave before evening and would have time to gather up my things, but Mr. Shelton had the family to move out of my house that morning. Then the wagon came right on to move me. Mr. Shelton's son came on, and came in the house, and told me he was ready. I asked him; 'Ready for what?' And he said: 'To move you.' Then I says, 'Well, I thought I would have to go, but I didn't have any idea I would be rushed out before I would have time to pick up my things.' "

John Ellis testified that he was a son of the plaintiff; that he lived about one mile from where his mother and Shelton lived while they were living together. When asked whether or not his mother, the appellant, had given him supplies and provisions out of the commissary, as charged by the appellee, he answered, "She didn't do either," and stated that he didn't

get any provisions or supplies out of Mr. Shelton's commissary through his mother.

The appellee, in his deposition, exhibited two papers which he claimed to have found on his gate post, in which he was warned to leave within forty-eight hours, and that his commissary or store was going to be burned. The appellant testified that she did not know anything about these papers. That if her children had anything to do with it she did not know it; that if they had anything to do with it they never mentioned it to her; that her children never showed any disposition to want to destroy or to burn up appellee's property. Appellee had stated also in his deposition that he was afraid to eat at the table prepared by appellant for fear that something mysterious would happen to him. Appellant stated that she couldn't understand that. In this connection, she says: "I always thought I couldn't do enough for my husbands, and for Mr. Shelton to think that I would put anything in his provisions I never thought of anything. I am told that that was the reason he quit eating at home, that he was afraid I would poison him, and I never thought of such a thing. I and the children and Mr. Shelton all ate together. Everything was cooked together, and I couldn't poison one without poisoning the others."

Three neighbors of the Sheltons were witnesses. They had heard that the Sheltons were not living together peaceably as husband and wife, and they agreed, after talking the matter over, that "if there was not something done something serious would happen, and that some of the neighbors ought to go over there and talk to them, and see if they couldn't get them to do better than they were doing and to bring about a reconciliation or something of the kind." They did go and talk to the Sheltons about the way they were getting along. One witness expressed it as follows:

"They (the Sheltons) didn't talk as though they thought they could live together any longer in peace. I spoke up and told them I had never advised anybody to separate, but it seemed to me like in these circumstances they would be better off separated than the way they were living."

The testimony of the other two witnesses on this point was substantially the same as the above.

The appellee himself testified that he didn't accuse appel-

lant of stealing or anything of the kind. He said: "The things would be missing, and I would merely ask her where they were, and she would say she didn't know anything about them, and I would tell her: 'You ought to know; you are in possession of the key when I am gone.' "

He further testified: "About the 1st of May, 1910, there came a little difference about something—I disremember what it was—being misplaced in the little store, and I asked her about it, and she just said she didn't know anything about it and that she couldn't keep them out of there. She didn't say who; but I said, 'I can keep them out.' I locked the door, and put the key in my pocket."

The court granted to the appellant a divorce, and also rendered judgment in her favor for one-third of the real estate belonging to the appellee, but refused to grant appellant an interest in the personal property of the appellee. The appellant appeals from the judgment of the court refusing to allow her one-third of the personal property of the appellee; and appellee prayed and was granted a cross appeal from the judgment in favor of appellant for divorce, attorney's fees, etc.

*J. R. Parker*, for appellant.

*William Kirten*, for appellee.

There is no corroboration whatever of appellee's testimony. The court erred in granting her a divorce. Kirby's Digest, § 2677; 34 Ark. 37; 54 Ark. 20; 83 Ark. 533.

WOOD, J., (after stating the facts). The statute provides that a wife, when granted a divorce against the husband, shall be entitled to one-third of the husband's personal property absolutely. The appellee contends that the appellant should not have been granted a divorce at all, and he is correct about it. There is no testimony except that of appellant herself to sustain the allegation of her complaint that the appellee had offered her such indignities as to render her condition in life intolerable. A divorce can not be granted upon her uncorroborated testimony. True, she says that she was accused by the appellee of taking goods out of his commissary, and that appellee slapped her, and to other things that, if corroborated, would be sufficient to sustain the decree of the chancellor granting her a divorce, but we are of the opinion that the tes-

timony of the other witnesses, which we have set out in the statement, fails to show any corroboration whatever of appelant's testimony.

The testimony of appellant's son to the effect that he had not received from his mother any goods out of the commissary did not tend to corroborate her statement that appellee had accused her of stealing these goods.

The testimony of the witnesses, who are neighbors of the Sheltons, to the effect that they had heard that appellant and appellee were not living peaceably as husband and wife, did not tend to corroborate appellant's testimony to the effect that her husband had mistreated her. The testimony of these witnesses as to what they had heard of the manner in which the Sheltons were living, without any personal knowledge of any disagreement between them or ill-treatment of appellant by the appellee, was hearsay and incompetent.

In *Sisk* v. *Sisk*, 99 Ark. 94, it is said: "Divorces are not granted upon the uncorroborated testimony of the parties and their admissions of the truth of the matters alleged as grounds therefor." To the same effect see, *Chappell* v. *Chappell*, 83 Ark. 533; *Scarborough* v. *Scarborough*, 54 Ark. 20; *Rie* v. *Rie*, 34 Ark. 37; Kirby's Digest, § 2677.

It follows that the court erred in granting the divorce and awarding the appellant one-third of the real estate of appellee, and did not err in refusing to allow plaintiff the personal property prayed for in her complaint; for if appellant is not entitled to a divorce she is not entitled to a division of the property at all.

The judgment is therefore reversed, and the complaint of appellant and the cross complaint of appellee are dismissed for want of equity.