TRANNUM *v.* GEORGE.

4-8197                                        201 S. W. 2d 1015

Opinion delivered May 12, 1947.

*J. B. Milham* and *Gladys Wied,* for appellant.

ROBINS, J.  Appellant, Clem Trannum, seeks by this appeal to reverse a judgment of the circuit court affirming an order of the juvenile court of Saline county by which four sons of appellant, aged nine, seven, five and one and one-third years, respectively, were declared to be "dependent children." By the same order the custody of these children of appellant was taken from him and vested in "Miss Ruth Johnston as child welfare consultant, Welfare Department, located at 400 West Markham street, Little Rock."

This proceeding was begun by the filing in juvenile court of petitions by Mrs. Margaret George, "child welfare worker," in which it was alleged that these children were "neglected" children.  After the juvenile court made the order depriving him of the custody of his children appellant prayed an appeal to the circuit court.

The children were thereupon taken from appellant and placed in what is designated as a "supervised foster home" in Pulaski county.  The location of this home has never been disclosed to appellant, but he was told that,

by taking the matter up with the Welfare Department, he could have the children brought to the office where he could visit them. When the case reached circuit court appellant moved to have the children brought into court so that the court and he, as the father of these children, might have an opportunity to observe their physical condition; but this motion was denied; and the lower court refused to compel the officers of the Welfare Department to disclose to appellant where his children were.

To sustain the order taking these children away from their father there was offered the testimony of Mrs. Margaret B. George, Mrs. Bessie Rommel, Warren Bumgarden, Leo Herzfeld and Miss Ruth Johnston.

Mrs. George testified that she was doing child welfare work for the Arkansas Department of Public Welfare; that she had an A.B. degree, majoring in social work. She introduced in evidence, over the objection of appellant, the record of her office involving the Trannum children. This record consisted of memoranda as to conversations had by welfare workers with various persons not witnesses at the hearing and also contained correspondence had with appellant's wife, who had left him and had gone to New Jersey to live with her relatives. Mrs. George testified that she made two visits to appellant's home, once before removal of the children and once afterwards; that the house was not filthy, but was dusty and cluttered, with no sheets on the beds; that there were beans and peas spread out for drying on the floor in one room; that appellant was not there the first trip and the children were not receiving proper parental care; that from the conversations with the neighbors the children never had a "stable" home; that neither the father nor the mother had been with these children all the time; that the oldest child (whose custody is not involved here), Richard, is a practically grown-up young fellow; that she could not state as to the moral and educational training of these children; that they seemed bright and presented themselves very well; that she had spent about thirty or thirty-five minutes in the home; that she was twenty-nine years old, married, but had no children herself.

Mrs. Rommel testified that she was in the welfare work, but not in the child welfare department; that she went to appellant's home with Mrs. George twice; that Mrs. Trannum had never asked her for money or support.

Warren Bumgarden, twenty-six years old and unmarried, testified that he was employed as "county visitor," working principally with the old and indigent; that when the Trannum children were brought in for the hearing in juvenile court he took them to a rest room and cleaned them up; (other testimony showed that some of the children were working out in the field when the officer came for them) that the children were in fair physical condition, but that Clement had a sore place on his head and scratches on his neck; that there were no stripes or other scratches on them; that Clement didn't look to be in good health, but the other children appeared to be in good physical condition and they had been fed properly; they had marks of perspiration on them and didn't look like they had been bathed in a month.

Leo Herzfeld, circuit clerk, introduced in evidence copy of a divorce decree, entered in 1944 by the chancery court, by which appellant's wife was granted a divorce from him, for indignities, and given the custody of their five children and $20 a week for support money, she being forbidden to take the children out of the state.

Miss Ruth Johnston testified that she was supervisor of Child Welfare and it was her duty to "study cases that they have under investigation and assist in arriving at a decision"; that she had been in the state two years, but had been in this work six years; that from the testimony she had heard and from the record of the department and her own knowledge she thought the foster home was better for the children than their father's home; that a foster home is a normal, average family home, *supported by a state fund* (italics supplied); these homes are investigated by welfare workers, and after children are put there regular visits are made; that she was willing to describe the home (where appellant's children were placed) but not at liberty to give the name; that it is a rural home and the board only pays the children's

expenses; that the children attend a consolidated school and are given the best of care; that parents are not permitted to visit the children there, but if a parent wants to see them the children are brought to the office; that all she knows about the Trannum family is what the records read in court say.

Henry Riffle, a witness for appellant, testified that he lived close to the Trannum family and knew them; that about a week after Mrs. Trannum went away he and his wife took the baby, Douglas, who was slightly ill, and that they were keeping him when the sheriff came and took him away; that they took good care of the child; that he had raised a family; that the child was in good health when the sheriff came; that he had seen the other children all along and they were "well and husky," and had nothing wrong with them except the one who had suffered from infantile paralysis; that appellant always treated witness "all right" and they had never had any trouble; that when they (witness and his wife) took the baby his bowels were "tore up some, not bad for a baby, he had a diaper rash"; that he went to appellant because of some talk and asked him to let him take the baby home for his wife to doctor, and that appellant insisted over the protest of witness on paying $5 a week for the care of the baby; that he (witness) had heard some of the neighbors say appellant was peculiar and some of them said he was a good fellow; that appellant kept his place as well as a man could keep it, not cluttered up; that witness would like to keep the child, Douglas; that Mr. and Mrs. Thompson are now living with appellant and his boy.

Mrs. Henry Riffle testified that appellant agreed, when Douglas was sick, for witness and her husband to take him; the child was teething, not real sick; that she had raised six children; that this baby was in good health while they had him; that it was like taking one of her babies when they took it away, and that she still would take care of it; that she didn't think a boy fourteen years old was capable of taking care of a baby; that appellant was then and is now working regularly and was too busy to care for it himself.

Mrs. Albert Thompson, aged eighteen, testified that she and her husband were living with appellant; that she had finished the eleventh grade and was reared in a family with small children; that she was there for the purpose of keeping house and caring for the Trannum children; that she felt qualified to do the work; that there are four rooms in the Trannum home; that they had plenty to eat.

Albert Thompson testified that appellant had employed him and his wife to stay with the children; that his wife does the cooking and he is helping appellant in his truck patches; that he had finished the eighth grade and worked at logging and other things.

Appellant testified that even when his wife was at home he had to cook and wash the clothes, including diapers; that his wife was an only child and was raised as a "pet"; that they had plenty of food; that he had punished the children at times; that he worked at the mines underground and drew $25.87 from the government as an ex-marine; that he also was a truck farmer and did this to earn additional money because his wife had been "quite a spender"; that he raised potatoes, peanuts, peas and corn; that his home was a four-room house with screen porch, with a barn and potato house; that he owned four horses; that "we do good with the children picking peas and beans"; that his wife had been going away at different times all during their married life; that he had never been fined nor sent to prison; "I work all the time and pay for what I use"; that nobody ever made any complaint to him about his family until the welfare officer came over; that he had employed Mr. and Mrs. Thompson to take care of his children, paying them $65 and all they want to eat; that he got along well on his income; that his wife and he couldn't get along; that his children obeyed him and were willing to help work; that Clement got the marks on his neck by falling in some briers and not by appellant whipping him; that appellant received an injury using a hand grenade in Nicaragua; that he shot powder all day in the mines; that his wife nearly twisted his finger off and called him some bad names

and he then slapped her with a boot; that he had been working for the Reynolds Mining Company for three years, handling the underground blasting; that he had sent his wife in New Jersey $119 at one time and had sent her money many other times.

Richard Trannum testified that he was thirteen years old; that he had plenty to eat; that his father was good to him; that he went to school and was in the fifth grade; that he chopped corn, gathered peanuts and peas; that when the sheriff came and got him and the other children they were out in the field picking peas; that the sheriff took them out of the field without letting them clean up; that "my mother was not as good to me as my daddy; my daddy, he is O.K."; that he was not in the room at the trial in juvenile court; that his daddy was always working.

Mr. J. B. Milham testified as to the good character of appellant.

This case might well be disposed of by sustaining the technical contention raised by appellant to the effect that the order of the juvenile court is void because it fails to recite the required jurisdictional facts. *Jackson v. Roach*, 176 Ark. 688, 3 S. W. 2d 976; *Ex Parte Kelley*, 191 Ark. 848, 88 S. W. 2d 65. But, since such a disposition of the case would be only a temporary one, we deem it proper to review the case on its merits, so that the question as to the custody of these children may be settled.

The General Assembly has not authorized courts in proceedings of this kind to receive in evidence documents such as that designated by witnesses in the trial below as the "record" of the Welfare Department. This "record" is chiefly a narrative report by the welfare worker of conversations she had concerning the case of the children with various parties and it also contains correspondence had with the mother of the children. All this was "hearsay" and should not have been admitted in evidence. Certainly the custody of a man's children ought not to be taken away from him on unsworn statements made out of court. *Title Guaranty & Surety Company* v.

*Bank of Fulton,* 89 Ark. 471, 117 S. W. 537; 33 L. R. A.,
N. S. 676; *Tipler-Grossman Lumber Company* v. *Forrest
City Box Company,* 148 Ark. 132, 229 S. W. 17; *Spencer
Lumber Company* v. *Dover,* 99 Ark. 488, 138 S. W. 985;
*Shelton* v. *Shelton,* 102 Ark. 54, 143 S. W. 110; *Roberson*
v. *Roberson,* 188 Ark. 1018, 69 S. W. 2d 275.

When this so-called "record" is eliminated from
consideration, as it must be, there is practically no evi-
dence indicating that the father of these children is unfit
to care for and rear them. He has a fairly comfortable
rural home, and had, before the trial in circuit court,
employed a man and his wife, apparently competent to
do so, to assist him in keeping the home and the rearing
of these children. Appellant is a hard worker and earns
good wages as a miner, in addition to what his farming
operations pay. No charge of dishonesty, laziness or
moral turpitude was made against him. There was no
proof that he was cruel to his children or indifferent to
their welfare. The most that could be said against him
was that he was a bad house-keeper and that his duties
as a miner and a farmer prevented him from giving his
children as much attention as they should have. He has
now, by the employment of a man and his wife to stay
in the home and assist in the housekeeping and looking
after the children, eliminated the principal objections to
his home and to the care for the children that was urged
by the Welfare Department.

It is true that in the "record" of the Welfare De-
partment introduced in evidence there was some more
serious criticism of him, but, even if all the hearsay and
gossip set forth in this "record" were weighed in the
scales against him, it would not be sufficient to over-
balance the fact that he is the father of these children and
shown by the evidence to be an honest, law-abiding and
hard-working man.

Justice WOOD, in the case of *Baker* v. *Durham,* 95 Ark.
355, 129 S. W. 789, correctly stated the rule applicable
in a case of this kind when he said: "It must be an
exceptional case, where the evidence shows such lack of

financial ability or such delinquencies in character of the father as to imperil the present and future welfare of his child, before a court . . . will deprive him of the duty and the privilege of maintaining and educating his child, and of the pleasure of its companionship.'' This was said by Judge EAKIN in the case of *Verser* v. *Ford,* 37 Ark. 27: ''It is one of the cardinal principles of nature and of law that, as against strangers, the father, however poor and humble, if able to support the child in his own style of life, and of good moral character, cannot, without the most shocking injustice, be deprived of the privilege by any one whatever, however brilliant the advantage he may offer.''

When the evidence as to the industry, financial ability and moral character of appellant is analyzed in the light of the holdings in the above-cited cases, it is apparent that the testimony was not sufficient to authorize the court to take these children away from their father, who seeks to retain them and who has been doing his best, under great difficulties, to care for them.

The judgment of the lower court is accordingly reversed, and judgment will be entered here awarding the custody of the said children to appellant, and an immediate mandate is ordered.